[No. B175564. Second Dist., Div. Eight. Aug. 1, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
OMAR BRADLEY et al., Defendants and Appellants.

COUNSEL

Ralph H. Goldsen for Defendant and Appellant Omar Bradley.

Richard D. Miggins for Defendant and Appellant Amen Rahh.

Tedford & Walters, James R. Tedford II; and Robert W. Walters for Defendant and Appellant John Johnson II.

Bill Lockyer and Kamala D. Harris, Attorneys General, Robert R. Anderson and Dane R. Gillette, Chief Assistant Attorneys General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters, Susan Sullivan Pithey and Steve D. Matthews, Deputy Attorneys General, for Plaintiff and Respondent.

---

OPINION

**FLIER, J.**—In 2006, we affirmed the convictions of appellants, Omar Bradley, Amen Rahh, and John Johnson II, for misappropriation and misuse of public funds under Penal Code section 424. Appellants were former high officials of the City of Compton (Compton or City).[1] Appellants were alleged to have misappropriated and misused public funds by (1) charging personal expenses to their City credit cards and (2) "double-billing" the City for their travel expenses by obtaining cash advances for the expenses and then, instead of paying for the expenses with cash advanced, charging such expenses to the City credit card.

More than five years later, the Supreme Court returned the case to us to reconsider it in light of *Stark v. Superior Court* (2011) 52 Cal.4th 368 [128 Cal.Rptr.3d 611, 257 P.3d 41] (*Stark*), which holds that section 424 requires "that the defendant knew, or was criminally negligent in failing to know, the legal requirements that governed the act or omission." (*Stark*, at p. 377.) Without the benefit of *Stark*, the trial court failed to instruct the jury on the scienter required for a violation of section 424. With respect to Johnson and Rahh, the error was harmless beyond a reasonable doubt and the judgments against them are affirmed. With respect to Bradley, the error was not harmless beyond a reasonable doubt, and the judgment against him is reversed.

---

[1] Omar Bradley was the elected mayor and Amen Rahh an elected member of the city council. John Johnson II was the appointed city manager. The jury returned not guilty verdicts as to two other council members, Delores Zurita (Bradley's aunt) and Yvonne Arceneaux.

All further statutory references are to the Penal Code unless otherwise indicated.

## PROCEDURAL HISTORY

Appellants and other defendants were charged by indictment with misappropriating public funds (§ 424, subd. (a) 1; count 1) and misusing public funds (§ 424, subd. (a) 2; count 2).[2] A jury returned guilty verdicts against appellants on both counts as charged.

The court denied probation to Bradley and Johnson. The court sentenced each to the midterm of three years in state prison on count 1, plus a concurrent three-year sentence on count 2. The court also imposed a restitution fine of $200 and imposed and stayed a parole revocation fine of $200 upon each of them. Bradley received a presentence custody credit of 140 days (subsequently recalculated to 158 days) and Johnson received a presentence custody credit of 141 days.

The court granted Rahh three years of formal probation on condition he serve one year in county jail and perform 200 hours of community service. The court ordered Rahh to pay a restitution fine of $200 and awarded him a presentence custody credit of 141 days. The parties stipulated that Rahh owed victim restitution in the amount of $8,523.37, and the court imposed a restitution order in that amount.

As noted, in 2006, we affirmed the convictions. After our high court returned the case to us, the parties filed supplemental briefs in which they dispute only whether the instructional error was harmless beyond a reasonable doubt.

## FACTS

### 1. *Prosecution Evidence*

Compton is a charter city governed by a city council. The Compton City Council consists of a mayor and four members, each representing a different district. The city council sets the policy and standards for the City and oversees the city manager, who is appointed by the mayor.

---

[2] The indictment charged appellants with violating former section 424, subdivisions (1) and (2). In 2003, those subdivisions were renumbered as (a) 1 and (a) 2. We use the current designations in referring to these offenses.

As amended, section 424 provides in pertinent part that "(a) Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who either: [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another; or, [¶] 2. Loans the same or any portion thereof; makes any profit out of, or uses the same for any purpose not authorized by law . . ." may be punished by imprisonment in state prison and is disqualified from holding any office in this state.

Bradley was first elected to the Compton City Council in 1991 and, from 1993 to June 30, 2001, served as the City's elected mayor. Rahh was elected to the city council in June 1999, the same month Bradley appointed Johnson city manager.

In July 1999, the city council unanimously passed a resolution authorizing the City to obtain corporate credit cards from specified issuers for the use of the city manager and city council members, including the mayor. The resolution established a policy for the use of the credit cards: Section 5 of the resolution expressly directed that "the corporate credit cards be utilized solely for approved City *business related* expenses." (Italics added.) The resolution also provided, in section 6, that "each card holder is required to account for all expenses and will be held personally liable for any unauthorized charges."

The credit card resolution was prepared by former City Controller Helen Tyler, at Johnson's request. The city controller's office routinely drafted resolutions for the city council concerning the budget, appropriations limit, auditors or purchases over $5,000.[3] The city attorney reviewed the credit card resolution only for legality and form and was present at the council meeting when the resolution passed.

Prior to the resolution's passage, the City had a travel request procedure that provided its officials with advances to pay for lodging, meals and transportation on City-related trips. Under the City's written travel policy, air travel was limited to the lowest coach fare and meal expenses were limited to a $75 per diem ($15 for breakfast, $25 for lunch and $35 for dinner). Under the travel advance procedure, the city council approved the business trips, the city manager or his designee approved individual travel requests and the city controller verified that funding for the trip was available before the travel advance was processed. The travel advance check was made directly payable to the city official so that he or she could cash the check and use the funds to pay for the approved travel expenses. If a person overspent the itemized allowance, he or she could request reimbursement upon return by submitting receipts and going through the requisition and approval process. The City required receipts for travel only if the official sought to be reimbursed for additional travel expenditures following a trip.

After the city council adopted the credit card resolution, Johnson secured corporate credit cards for himself, the mayor and other council members

---

[3] The city manager had discretionary spending authority to approve a City-related expense under $5,000.

pursuant to the resolution. However, the City continued its practice of providing travel advances to these officials.[4]

Normally, all incoming mail for the City was delivered to the city clerk's office for sorting and routing to the various municipal departments. When the first corporate credit card bills started arriving in October 1999, the bills were delivered to the city clerk's office. Out of curiosity, then City Clerk Charles Davis opened a credit card statement addressed to Johnson and noticed a charge for a tuxedo rental. The tuxedo charge captured Davis's attention because it did not appear to be related to City business. Around this time, Tyler questioned Johnson about his ordering a second set of credit cards, and Johnson told her "he could do what he wanted to do."

Tyler later became aware of credit card charges that Johnson had incurred while attending a Congressional Black Caucus (CBC) conference, in Washington, D.C. The statement included the tuxedo rental charge, along with charges for a rental car and hotel stay. The tuxedo rental appeared to Tyler to be a personal expense, and Tyler was aware that Johnson had received a travel advance for the rental car and hotel expenses. Tyler confronted Johnson about these items. Johnson told Tyler he discovered he needed a tuxedo while on the trip and decided to rent one. Johnson promised to write a check for the tuxedo rental charge but Tyler never received it. Soon afterwards, Tyler left her City post.

In November and December 1999, KCOP Channel 13, a local television station, submitted two requests to the city clerk for access to City credit card records under the California Public Records Act.[5] Davis forwarded the requests to Johnson's office. Davis did not know if the City ever replied to the public records request.

After the KCOP public records requests and following a meeting with Bradley, Johnson directed the city clerk to send all credit card bills directly to the city manager's office. The stated rationale was to avoid distributing credit card numbers and information to the public. Davis ignored this directive and continued to route credit card statements to the city controller's office. The city controller's office, however, forwarded the credit card bills, unopened, to the city manager's office.

Upon receiving credit card bills, Johnson's special assistant, Linda Timmons-Iverson, submitted them to Johnson for review. At Johnson's

---

[4] According to Tyler, if a person received a travel advance but used their credit card to pay those expenses, he or she would be expected to give the travel expense check back.

[5] The California Public Records Act (Gov. Code, § 6250 et seq.) assures public access to "information concerning the conduct of the people's business." The corporate credit card statements were subject to Public Records Act requests.

direction, Timmons-Iverson then redacted the account number and purchase information from the bills and forwarded only a redacted copy of the statements to the city controller to process pay warrants for the bills. Timmons-Iverson kept the original unredacted credit card statements in a file in the city manager's office.

In May 2000, Johnson designated Tana McCoy (Bradley's sister), an assistant to the Compton City Council, as the person in charge of processing credit card payments for the mayor and other city council members. Timmons-Iverson continued to process payments for Johnson's City credit card. McCoy's duties included making travel arrangements, processing office payments and receiving mail for council members. McCoy's practice was to give the cardholder a copy of his or her corporate credit card statement for review upon receipt. Afterwards, at Johnson's direction, McCoy redacted the expenditures section and all but four digits of the credit card number before sending a redacted copy of the statement to the city controller for authorization of payment. McCoy followed Johnson's directive from May 2000 through at least September 2001.

In June 2000, acting City Controller Marilynn Horne, Tyler's successor, received a request for a pay warrant from the city manager's office. Attached to the request was a redacted credit card statement signed by Johnson and a colleague. Horne objected to issuing the pay warrant because the payment information on the statement had been concealed. Horne spoke with then assistant city manager Laurence Adams, who approved the payment. Horne was still not satisfied and insisted that the authorization be put into writing because she wanted "something for her files." As a result, Adams, and later Johnson, signed a memorandum addressed to Horne authorizing payment of redacted credit card bills. The memorandum stated that the original unredacted credit card statements were being retained by the city manager's office "for security reasons." Subsequently, Horne asked Timmons-Iverson and McCoy for access to the unredacted statements in order to have something to "back up" the credit card payments and was told she could not have the statements.

On three occasions in 1999 or 2000, Davis spoke with Johnson about Johnson's misuse of the corporate credit cards. Once, Davis asked Johnson if he was "prepared to go to jail for this." Johnson did not reply. Davis also confronted all three appellants during an executive session of a city council meeting in October 1999, after the first credit card bill had arrived at the City. Davis warned appellants that they should be careful in using the corporate credit cards or "somebody was going to go to jail." Rahh responded by saying, "We're grown."

In late 1999, Compton City Treasurer Douglas Sanders complained to the Los Angeles District Attorney's Office that appellants and others were using City credit cards for personal expenses and double billing the City for their travel expenses. The district attorney's office opened an investigation on the basis of the information Sanders provided. In May 2001, investigator Frank Watler, a former Los Angeles County Sheriff's deputy employed by the district attorney's office, took over the investigation.

In September 2001, Watler obtained a search warrant seeking financial records from 11 locations in Compton, including city hall and various banks. Watler and a team of investigators seized the City's banking records, credit card information and travel-related documents for the period from July 1, 1999, through September 17, 2001, the date of the search warrant. Watler later reviewed the seized documents and compiled a list of questionable charges.

At Watler's request, the Los Angeles County grand jury issued subpoenas for the vendor documents relating to each of the questioned charges. After obtaining the vendor documents, Watler enlisted the aid of Jane Ngo, an investigative auditor for the County of Los Angeles. Watler and Ngo divided the investigation so that Watler investigated apparent personal expenses and Ngo potential double billing by appellants and others. Watler reviewed credit card charges and compared them to vendor receipts to prepare a list of personal expenses charged to the City credit cards. Ngo reviewed 57 bankers boxes of records and reduced the information to a comprehensive accounting spreadsheet for each business trip taken by appellants and others. Ngo determined that as to all defendants who were ultimately indicted by the grand jury, and independent of any reimbursements, a total of $20,833.34 in travel funds had not been used for their intended purpose.

Ngo also prepared a report of reimbursements to the City from appellants. She separated the reimbursements into those she could connect with a specific event and those that she could not connect with any specific event. Ngo found that many of the reimbursements occurred after Bradley left office and after a new mayor succeeded Bradley.

Watler and Ngo's investigation revealed, and the prosecution's evidence at trial showed, that appellants used their City credit cards to charge the City for personal expenses and to engage in multiple instances of double billing.

Johnson charged over $10,000 in personal expenses to his City credit card and double billed the City almost $6,000 for travel expenses in the period from September 1999 to May 2001. As discussed, *post*, Johnson paid $5,000 directly to one of the corporate credit card issuers in February 2001. In July

2001, Johnson repaid the City $525 for one of his trips. In July and August 2001 and in February and June 2002, Johnson made almost $18,000 in reimbursements to the City, which Ngo could not link to any particular expenditure.[6]

Rahh charged over $7,000 in personal expenses on his City credit card and double billed the City about $6,600. Rahh did not repay the City for any specific trip but made reimbursements of about $5,500 in the latter part of 2001 and in 2002. Rahh repaid the City $2,600 of that amount within two days of the new mayor's taking office in July 2001.

Bradley charged over $3,800 in personal expenses on his City credit card, double billed the City over $3,700 and in addition failed to return travel advances for two conferences that the jury could infer he failed to attend. Bradley repaid the City $300 for one of his trips in December 1999. He made $5,600 in miscellaneous reimbursement payments in September 2000 and September 2001.

Over the course of a three-month trial, the prosecution put on extensive testimony from Watler and Ngo and present and former City officials and employees, as well as numerous vendors and other witnesses, to establish appellants used their City credit cards to incur personal expenses and to double bill the City for travel expenses.

2. *Defense Evidence*

Johnson did not testify at trial but called two witnesses in his defense.

Rahh took the stand and testified that the various expenses he charged to his corporate credit card were for City-related business and he used his travel advances for other City-related expenses, such as hosting restaurant meals for his unofficial advisory committee. Rahh testified expenses such as golf fees were business related as they reduced his stress and he considered in-room movie charges to be an aspect of his per diem. Rahh also testified that on various occasions, Johnson, as city manager, gave him verbal permission to spend City funds to take his volunteer advisory boards to restaurants. To the extent some of his expenses, such as airfare for family members, car rentals for a friend or dentures for his brother, were not considered City-related, he had believed they would be covered automatically by the City's "charge on badge" program. The charge on badge program allowed enrolled City employees to charge up to a maximum of $500 by showing their City badge at

---

[6] The City withheld approximately $16,600 from Johnson's final paycheck to cover, according to Watler, Johnson's "questionable, possibly personal" credit card charges.

participating Compton businesses and to have the City deduct $50 per month from their paycheck until the debt was paid. It was designed to encourage economic development in Compton and allowed City employees to charge personal expenses. Horne testified that Rahh asked to have $100 taken from his paychecks to pay obligations he owed the City.

Bradley testified on his own behalf and asserted that each of his expenditures was a legitimate City-related business expense, except for in-room movie charges.[7] For example, Bradley claimed green fees, golf cart rentals and clothing expenses he incurred at a resort were business related because he was playing golf with a representative of a provider of utility services in Compton, and they discussed business. According to Bradley, state conflict of interest laws prohibited the utility representative from paying for Bradley, so Bradley decided to use his City credit card to pay for the representative and another private party instead. Bradley also testified that he received authorization from Johnson for several of his expenses. Bradley testified that over his tenure as mayor he frequently covered travel expenses with his personal funds because the City often failed to provide him with sufficient advance funds. He asserted he never asked the City for reimbursement as he wanted the City "to enjoy the benefit of [his] personal funds." Bradley called a variety of witnesses to testify.

## DISCUSSION

1. *Substantial Evidence Supports Appellants' Convictions*

Appellants argue that the evidence was insufficient to support their convictions. We disagree.

In reviewing the sufficiency of evidence supporting a conviction, our review is a very narrow one. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Sales* (2004) 116 Cal.App.4th 741, 746 [10 Cal.Rptr.3d 527].) We will not disturb the trier of fact's determination of the credibility of witnesses and the truth or falsity of the facts on which that determination depends. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) Reviewing the record under this standard, we find ample evidence to support appellants' convictions.

---

[7] Bradley contended at trial that the in-room movie charges fell within the exception for "incidental and minimal" expenses under Penal Code section 424, subdivision (c), which excepts from prosecution "the incidental and minimal use of public resources authorized by Section 8314 of the Government Code." Government Code section 8314, subdivision (b)(1) prohibits the use of public resources for a "personal purpose" but defines "personal purpose" to exclude "incidental and minimal use of public resources, such as equipment or office space . . . including an occasional telephone call."

There is no dispute, and the evidence establishes, that appellants were public officers "charged with the receipt, safekeeping, transfer, or disbursement of public moneys." (§ 424, subd. (a).) There is also substantial evidence that each appellant unlawfully appropriated public money for his personal use (§ 424, subd. (a) 1) and unlawfully used public money for a purpose not authorized by law (§ 424, subd. (a) 2). Additionally, there was evidence that appellants were at a minimum criminally negligent in failing to know the legal requirements underlying the section 424 charges.

Johnson made at least six personal purchases on his City credit card between September 1999 and September 2001. For example, in the summer of 2000, Johnson used the City credit card to take his son's San Bernardino County-based basketball team to Florida for a tournament. He charged over $5,300 on his card for airline tickets, hotel accommodations, a rental van and concert tickets at the House of Blues for the team's expenses. In November 2000, Johnson used his credit card at Best Buy to purchase a camcorder, a digital camera and accessories totaling over $2,400. In the same month, Johnson also charged over $1,100 to his City credit card to pay for a three-year family membership at 24 Hour Fitness in Rancho Cucamonga.

Johnson double billed the City on at least seven occasions between September 1999 and September 2001, including expenses at the CBC conferences in September 1999 and September 2000, California Cities conference in July 2000, International City/County Management Association conference in September 2000, National Forum for Black Public Administrators (NFBPA) conference in April 2001, California Contract Cities (CCC) conference in May 2001 and "ICA" conference in July 2001.

Based on the following evidence, a reasonable juror could have inferred that Johnson knew the legal requirements that governed his conduct. Johnson told his assistant Timmons-Iverson that the Florida charges were personal and instructed her not to pay that portion of the City's credit card bill. However, it was not until seven months later, in February 2001, that Johnson sent a payment of $5,000 directly to the credit card company. He accompanied the payment with a letter stating the payment was for "personal" purchases on his "business account." In early 2002, Johnson admitted to Dorri Robertson, an assistant in his office, that the Florida, Best Buy and 24 Hour Fitness charges were "personal" expenses.

On at least 12 occasions between September 1999 and September 2001, Rahh used his City credit card to pay for personal expenses, such as dentures for his brother, airfare for family members, rounds of golf, in-room movies and rental cars for a coemployee at Compton College. The prosecution established that Rahh also double billed the City for expenses incurred during

at least nine conferences, including the CBC conferences in September 1999 and September 2000, League of California Cities (LCC) conferences in October 1999 and September 2000, "ICA" conferences in July 2000 and July 2001, Black Correctional Officer Training conference in September 2000, NFBPA conference in April 2001 and CCC conference in July 2001. From this evidence, a reasonable juror could have concluded that Rahh was at least criminally negligent in failing to know his actions were without legal authority.

The evidence established that Bradley charged personal expenses to his City credit card on at least eight occasions from September 1999 to April 2001, including airfare for his family, green fees and golf cart rentals at country clubs and resorts, golf clothing, a pair of golf shoes, cigars, golf balls, in-room movies and a three-day stay in the penthouse at the Torrance Marriott Inn. Bradley also double billed the City on at least six occasions during the relevant period, including the CBC conference in September 1999, National Association of Black School Educators conference in November 1999, LCC conference in September 2000 and Chicano Student Union Black History conference in February 2001. There was further evidence from which it could be reasonably inferred that Bradley received travel advances but did not attend a Gambling & Risk Taking conference in June 2000 and a CCC conference in May 2001. Jurors could infer knowledge or criminal negligence from Bradley's tender of a $4,000 check to the City with an indication it was "a reimbursement for any outstanding charges on Mayor Bradley's credit card."

As to the sufficiency of the evidence, appellants raise numerous contentions, none of which appears meritorious. For example, Rahh claims the prosecution failed to prove he misappropriated travel advances by not tracing how he actually spent such funds. Once the prosecution showed that travel advances were provided to appellants for specified purposes and appellants did not use the funds for the intended purposes but rather charged those expenses to their City credit cards, the jury could infer appellants misappropriated the funds.

In his reply brief, Bradley argues that nothing in the credit card resolution mentions cash advances or precludes use of the City credit card to purchase goods or services for which a cash advance was issued. Appellants' convictions are not grounded upon the credit card resolution but upon section 424, which prohibits government officials from misappropriating or misusing public funds.

Bradley also argues that retention of unspent funds cannot become "unauthorized" unless some law specifies a deadline or unless the public

entity has made a demand for return of the funds and the defendant has not reasonably complied. Section 424 is crystal clear in not imposing any such requirement. As our Supreme Court stated in *People v. Dillon*, "[t]he wisdom of the legislature in requiring custodians of public moneys to hold them inviolate is both a protection to the public and to the officer as it tends to remove from him the temptations that beset those who have large sums of money in their possession free from immediate demands." (*People v. Dillon* (1926) 199 Cal. 1, 15 [248 P. 230].) When a public entity entrusts public funds to a public official, he or she is authorized to hold the funds only so long as necessary for the purposes required. Any funds unused for the intended purpose must be promptly returned to the public entity that has entrusted the funds. Nothing in section 424 requires the public entity to set a deadline for, or demand, the return of such funds. To assume a public official may hold entrusted funds indefinitely unless authorization is revoked violates the letter and spirit of section 424.

Bradley argues that every one of his challenged expenditures "had an arguable municipal purpose" and thus the evidence was insufficient to prove he purchased goods or services for personal benefit. The credit card resolution allowed the City credit cards to "be utilized *solely* for approved City *business* related expenses." (Italics added.) Whether a particular expenditure was a personal rather than a municipal expenditure was a question of fact to be determined by the jury.

2. *The Trial Court Failed to Properly Instruct the Jury on the Elements of the Section 424 Offenses*

██ Several years after trial, our Supreme Court clarified the requirements of section 424. In *Stark*, the high court held that section 424, subdivision (a) 1 requires "a broader mental state beyond a mere intent to do the act." (*Stark, supra*, 52 Cal.4th at p. 395.) "Without a mental state as to legal authorization, a defendant could be convicted of violating the section 424 provisions by simply acting or failing to act, even if he was unaware of the facts, as defined by statute, that made his intent wrongful." (*Id.* at p. 396.) Instead, "the People must prove, as a matter of fact, *both* that legal authority was present or absent, *and* that the defendant knew of its presence or absence." (*Id.* at p. 398.) The People must show either actual knowledge or criminal negligence "in failing to know the legal requirements underlying the section 424 charges." (*Id.* at p. 399.)

"A criminal negligence standard protects both the public and the accused. If public officials and others entrusted with control of public funds subjectively believe their actions or omissions are authorized by law, they are protected from criminal liability unless that belief is objectively unreasonable,

i.e., is the product of criminal negligence in ascertaining legal obligations. Public officials and others should not be criminally liable for a reasonable, good faith mistake regarding their legal responsibilities. Nor is section 424 intended to criminalize ordinary negligence or good faith errors in judgment." (*Stark, supra*, 52 Cal.4th at p. 400.)

Under *Stark*, the trial court erred in failing to instruct the jury on the required scienter (and respondent does not argue otherwise).[8] When, as here, the court fails to instruct on an element of an offense, we must review the record to determine if the error was harmless beyond a reasonable doubt. (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1238–1239 [117 Cal.Rptr.3d 558].) The error is reversible " 'unless it can be shown "beyond a reasonable doubt" that the error did not contribute to the jury's verdict.' [Citation.]" (*Ibid.*; see *People v. Flood* (1998) 18 Cal.4th 470, 504 [76 Cal.Rptr.2d 180, 957 P.2d 869].)

"One situation in which an instructional error in omitting an element of an enhancement allegation from jury consideration may be found harmless is when 'the defendant concedes or admits that element.' [Citation.] Another situation warranting a harmless error conclusion is where '*all* of the evidence at trial relevant to the issue in question [is such that] there is no rational basis upon which the instructional error could have affected the jury's verdict.' [Citation.]" (*People v. Nordberg, supra*, 189 Cal.App.4th at p. 1239.)

A. *As to Johnson the Error Was Not Prejudicial*

As to Johnson, there was no rational basis upon which the error could have affected the jury's verdict. The evidence supported only the conclusion that Johnson acted with knowledge his misappropriations were without legal authority. When questioned by the city clerk about his credit card statements, Johnson ordered them rerouted so the city clerk would not be able to see them. Johnson also ordered the city controller's office to redact the credit card statements. The evidence of Johnson's efforts to conceal the credit card statements was undisputed and no contrary evidence was introduced. Based on this undisputed evidence, no reasonable juror could have concluded that Johnson lacked the requisite intent.

In addition to undisputed evidence that Johnson covered up the charges, there was evidence that Johnson admitted his purchases were not authorized. When questioned by Tyler about the tuxedo rental, Johnson stated that he would have written a check if he had his checkbook, acknowledging both that

---

[8] *Stark* did not involve section 424, subdivision (a) 2, but its reasoning is equally applicable to that subdivision.

he owed the City for the expense and that the charge was not a City expense. Johnson further admitted that several expenses were personal including the camera, the House of Blues tickets, the stay at the Days Inn, a car rental, plane tickets, and his *family* membership at 24 Hour Fitness. Johnson's admissions indicate he had actual knowledge of the legal requirements and simply ignored them. Although Johnson did not admit every expense was personal, he offered no evidence that any of his challenged expenditures were City business-related expenses. The instructional error therefore did not prejudice Johnson.

### B. *As to Rahh the Error Was Not Prejudicial*

The parties stipulated that Rahh bought dentures for his brother—an expense that can only be characterized as personal. Additionally, Rahh purchased plane tickets for his family, another expense that can only be characterized as personal. Rahh also rented a car for Mable Edwards—a person with no affiliation to the City—simply because her car had been repossessed.

Although Rahh testified he believed these personal expenses were paid through the charge on badge program, no reasonable, properly instructed jury would have acquitted him based on this defense. The amount of the dental bill was more than permissible on the charge on badge program and the dentist was located in the City of Inglewood, not Compton. Rahh's memo accompanying his repayment indicated the dental work was for himself, suggesting that he knew it was improper to purchase the dentures for his brother. Like the dentures, Rahh's family travel and car rental did not fall within the parameters of the charge on badge program. Additionally, Rahh did not tell Horne to take money out of his account to pay the dental charges or his family travel.

There was evidence that Rahh had knowledge of the legal requirements. When Davis warned appellants that they should be careful in using the corporate credit cards, or "somebody was going to go to jail," Rahh responded by saying, "We're grown." Additionally, Rahh spoke to Howard Caldwell, the former city manager, who told Rahh to repay the City for the dental expenses. As to Rahh, the error in instructing the jury was harmless beyond a reasonable doubt because jurors could have found nothing less than criminal negligence.

### C. *As to Bradley the Error Was Prejudicial*

In contrast to Johnson and Rahh, the error with respect to Bradley was not harmless beyond a reasonable doubt. Bradley presented evidence,

which if credited by the trier of fact, negated his wrongful intent. Bradley testified he conferred with Johnson regarding many of the expenses and received permission to use the funds for purposes other than the initially intended purpose. Even the prosecution agreed that for some of the expenses Bradley had received authorization from Johnson, who was authorized to approve expenditures under $5,000. Additionally, Ngo acknowledged she could not determine if funds not used for their intended purpose were used for other City-related business—which was the crux of Bradley's defense. Bradley's effort to argue that he had authorization from Johnson and that he spent funds on other City-related business was undermined by the prosecution's argument, supported by the erroneous instructions, that appellants had to intend only the act that resulted in the misappropriation.[9] Bradley's testimony that he believed the golf games and hotel stays were properly charged to the City because he discussed City business during them also could not be evaluated by jurors absent the instruction on intent. The instructional error therefore was not harmless beyond a reasonable doubt as to Bradley.

3. *The Trial Court Properly Instructed the Jury That Restitution Was Not a Defense*

Appellants contend the trial court erred in instructing the jury that restitution was not a defense to the charges in this case. We disagree.

In general, "[r]estoration of property feloniously taken or appropriated is no defense to a charge of theft." (*People v. Pond* (1955) 44 Cal.2d 665, 674 [284 P.2d 793].) "[O]ffers of restoration, in whole or in part, [are] only matters which the court might consider in mitigation of punishment."

---

[9] During closing argument, the prosecution argued: "When a person intentionally does that which the law declares to be a crime, he or she is acting with general criminal intent even though he or she may not know that his or her act or conduct is unlawful. You don't have to intend to have violated the law. You don't even have to know if it was a violation of law. It simply doesn't matter. Because when a person intentionally does that which the law declares to be a crime, he's acting with general criminal intent even though he doesn't know that the act or conduct is unlawful." The prosecutor argued that to violate section 424, a person does not have to "intend to misappropriate the money," but instead "the intentional doing of an act that results in the misappropriation," is sufficient. The prosecutor expressly told jurors that it was no defense that the defendant "did not know that the act was unlawful" or that the defendant "believed it be lawful." The prosecutor stressed in rebuttal argument: "A violation of the crimes charged in the indictment does not require a proof of an intent to steal or misappropriate. Nor is it limited to theft alone. But it includes the intentional doing of an act that results in the misappropriation. That is the intent that is required for these particular crimes."

The court instructed the jury that "[g]eneral intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, [he] [she] is acting with general criminal intent, even though [he] [she] may not know that [his] [her] act or conduct is unlawful."

(*People v. Costello* (1951) 107 Cal.App.2d 514, 518 [237 P.2d 281].) ▮ A violation of section 424 is complete as soon as public money is willfully misappropriated to the defendant's use or the use of another. " '[I]t is the immediate breach of trust that makes the offense, rather than the permanent deprivation of the owner of his property.' " (Cf. *People v. Talbot* (1934) 220 Cal. 3, 16 [28 P.2d 1057]; see 2 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against Property, §§ 25, 36, pp. 45, 59.)

In this case, the crimes were complete when the City credit card was used to make a personal purchase or to pay for a personal item or when appellants failed to promptly return advance funds that were not used. Hence, the trial court properly instructed the jury that restitution was not a defense to the crime of misappropriation of public funds.[10] We note, moreover, that the "restitution" involved here was, for the most part, repayment prompted by criminal investigation into misappropriation rather than the untimely return of advanced money or innocent recognition of an oversight.

4. *The Trial Court Properly Refused to Instruct the Jury on "Entrapment by Estoppel"*

Appellants Bradley and Rahh contend the trial court erred in refusing to instruct the jury on the defense of entrapment by estoppel, i.e., "reasonable reliance on advice of a government official." We disagree.

▮ The premise of the defense of entrapment by estoppel is that "the government may not actively provide assurances that conduct is lawful, then prosecute those who act in reasonable reliance on those assurances." (*People v. Chacon* (2007) 40 Cal.4th 558, 568 [53 Cal.Rptr.3d 876, 150 P.3d 755].) It is a narrow exception (*id.* at p. 569), and is inapplicable here because Johnson and Adams, even if they provided authorization to Bradley and Rahh for certain expenditures, had no power to enforce or prosecute the criminal laws of this state (see Gov. Code, § 26500; *Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 745 [124 Cal.Rptr.2d 591]). Additionally, Bradley and Rahh cite no evidence that Johnson or Adams informed them their conduct was lawful. (See *Chacon, supra,* at p. 568.) Thus, they were not prosecuted for conduct that they were assured was lawful.

5. *Appellants Were Not Prejudiced by Any Admission of Lay Opinion*

Appellants contend the trial court admitted improper lay opinion testimony from nine witnesses on (1) whether appellants' expenditures should be

---

[10] Rahh contends that he was denied due process and equal protection under the law because codefendant Zurita was effectively afforded, and he was denied, a restoration defense. This was not the case. The prosecution argued that Zurita's conduct *was* criminal because repayment was not a defense but asked the jury to convict Zurita on the basis of other, more egregious, conduct. Zurita therefore was not afforded a defense denied Rahh.

deemed proper and therefore authorized and (2) the meaning and intent of the credit card resolution. Appellants waived the objection as to most of these witnesses, and the court either did not err in admitting testimony or, if there was error, the error was harmless.

■ "A lay witness may testify to an opinion if it is rationally based on the witness's perception and if it is helpful to a clear understanding of his testimony." (*People v. Farnam* (2002) 28 Cal.4th 107, 153 [121 Cal.Rptr.2d 106, 47 P.3d 988]; see *People v. Maglaya* (2003) 112 Cal.App.4th 1604, 1608 [6 Cal.Rptr.3d 155]; see also Evid. Code, § 800.) The decision whether to permit lay opinion rests in the sound discretion of the trial court. (*People v. Medina* (1990) 51 Cal.3d 870, 887 [274 Cal.Rptr. 849, 799 P.2d 1282].)

■ Appellants waived the claim of error for all but three witnesses by failing to object on the ground their testimony would constitute improper lay opinion. (Evid. Code, § 353, subd. (a); *People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

■ Although appellants preserved their objection to the testimony of Watler, Ngo and Tyler as improper lay opinion, the trial court did not abuse its discretion in admitting their testimony with the exception noted, *post*. None of the witnesses expressed an opinion of the legality of appellants' expenditures. Investigator Watler merely provided a list of questioned expenses to explain to the jury how he focused his investigation. By agreement, investigative auditor Ngo used the phrase "funds not used for their intended purpose" in her testimony, simply to indicate that funds had not been used for their intended purpose from an accounting standpoint. Tyler's testimony regarding appellants' expenditures was also proper, since Tyler had the responsibility for paying City bills and had personal knowledge of City expenditures as city controller. "In the dynamics of trial, the court of original investigation can best appraise the danger of a question calling for an opinion or conclusion . . . ." (*People v. Otis* (1959) 174 Cal.App.2d 119, 126 [344 P.2d 342].)

■ The single exception is Tyler's testimony concerning her intent in drafting the credit card resolution. The court erred in admitting such testimony since it constituted improper and irrelevant lay opinion. Statements by a bill's author as to its intended purpose are not cognizable evidence of the legislative intent. (See *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37–38 [34 Cal.Rptr.3d 520]; *People v. Patterson* (1999) 72 Cal.App.4th 438, 443–444 [84 Cal.Rptr.2d 870].) Courts must look first to the plain words of an enactment and, if there is no ambiguity in the language, must presume the legislative body meant what it said without resort to legislative history. (*People v. Patterson, supra*, at

p. 442.) Because the credit card resolution is unambiguous on its face, the trial court had no reason to look to legislative history.

Even if there was error in admitting lay testimony, however, the error was harmless because it is not reasonably probable the jury would have reached a result more favorable to appellants had the error not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; see *People v. Melton* (1988) 44 Cal.3d 713, 745 [244 Cal.Rptr. 867, 750 P.2d 741]; *People v. Zambrano* (2004) 124 Cal.App.4th 228, 243 [21 Cal.Rptr.3d 160].) Appellants had ample opportunity to cross-examine the witnesses, including Tyler, dispelling any possible prejudice. (*Nolan v. Nolan* (1909) 155 Cal. 476, 480–481 [101 P. 520]; see 3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 173, pp. 236–237.)

6. *The Trial Court Properly Excluded the Testimony of Paul Richards*

Appellants contend the trial court erred in excluding expert testimony from Paul Richards, an attorney and former city manager for Compton and a former mayor and council member for the City of Lynwood.

In Evidence Code section 402 hearings outside the jury's presence, Richards proposed to testify as a municipal expert that the credit card resolution did not "contemplate criminality."

A trial court's determination whether an expert's testimony is admissible is reviewed for an abuse of discretion. (*Caloroso v. Hathaway* (2004) 122 Cal.App.4th 922, 928 [19 Cal.Rptr.3d 254]; *Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1168 [82 Cal.Rptr.2d 162].) Richards's proposed testimony that the credit card resolution did not "contemplate criminality" would have invaded the province of the trial court in instructing the jury on the applicable law. The court had already properly determined that the plain language of the resolution did not affect potential criminal liability under section 424, and Richards's proposed testimony would have provided no assistance. We find no abuse of discretion in the court's exclusion of Richards's expert testimony. (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 884 [254 Cal.Rptr. 336, 765 P.2d 498]; *Summers v. A. L. Gilbert Co., supra,* 69 Cal.App.4th at p. 1182; *Downer v. Bramet* (1984) 152 Cal.App.3d 837, 841 [199 Cal.Rptr. 830].)

Rahh further contends the exclusion of Richards's proffered testimony deprived him of a right to present a defense and thus deprived him of due process and a fair trial as guaranteed by the federal and state Constitutions. This contention is unsupported by argument or authority and thus has been

waived. (*Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 237–238 [118 Cal.Rptr.2d 313].)[11]

## 7. *There Was No* Griffin *Error*

Johnson contends on two occasions during closing arguments one of the prosecutors improperly commented on Johnson's failure to testify, in violation of *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*).[12] Under *Griffin*, a prosecutor may not exploit a defendant's exercise of the Fifth Amendment right not to testify against himself or herself by directly or indirectly referring to the defendant's failure to take the stand at trial. (*Griffin, supra*, at p. 615.)

During closing argument, the prosecution stated "[t]here was no valid explanation given by the city manager as to why the public could not see the actual credit card statements." Johnson's counsel moved for a mistrial at sidebar on *Griffin* grounds, stating the prosecutor's statement that "nobody got up to testify about the purpose of these redactions" was an attempt to "draw[] attention to the fact that Mr. Johnson has not testified." The trial court denied the motion.

When the prosecutor returned to his argument, he told the jury that Johnson "has a constitutional right not to testify" and the jury could not draw an inference from the fact that Johnson did not testify because he was "entitled to just sit in that chair on his constitutional right and not say anything." The prosecutor stated: "to the extent that anything I have said about [Johnson's] lack of explanation [can] be interpreted as implying that he didn't get on the stand and testify, that is not what I'm talking about. [¶] What I'm talking about is during the time these crimes were being committed starting back in 1999 until the fall of 2001, which is the time period we're referring to, that there was an opportunity for Mr. Johnson and all of these

---

[11] In his reply brief, Rahh asserts for the first time that the trial court erred in excluding Richards's testimony wholesale because Richards could have offered an opinion on other issues, including "what constituted the authority of law." Whether appellants acted under authority of law is another facet of whether the resolution "contemplated criminality," i.e., a question of law. Appellants in any event did not offer Richards's testimony in the trial court for any purpose other than "to talk about what the law is" and thus have failed to preserve the issue on appeal. (See *Doers v. Golden Gate Bridge etc. Dist.* (1979) 23 Cal.3d 180, 184–185, fn. 1 [151 Cal.Rptr. 837, 588 P.2d 1261]; *Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 546 [39 Cal.Rptr.2d 432].)

[12] In his opening brief, Johnson perfunctorily also mentions *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91, 96 S.Ct. 2240], without framing any argument under *Doyle*. We therefore need not consider any claimed *Doyle* violation even were the case applicable. (*People v. Mendoza* (2000) 24 Cal.4th 130, 168 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Barnett* (1998) 17 Cal.4th 1044, 1182 [74 Cal.Rptr.2d 121, 954 P.2d 384].)

defendants to come forward and give an explanation as to how they were spending the City's money." Johnson's counsel later renewed his motion for mistrial on the basis of the prosecutor's "intentional" misconduct in "commenting on [Johnson's] right to take the Fifth Amendment." The court again denied Johnson's motion for mistrial, finding the prosecutor's comments did no more than paraphrase instructions the court had already given the jury.

■ We agree with the trial court that there was no *Griffin* violation. With respect to the prosecutor's comments prior to Johnson's first motion for mistrial, the prosecutor could properly argue that the defense had presented no reasonable evidence explaining why public records were redacted. (*People v. Medina* (1995) 11 Cal.4th 694, 756 [47 Cal.Rptr.2d 165, 906 P.2d 2].) *Griffin* does not prohibit a prosecutor from commenting on the state of the evidence. (*People v. Hughes* (2002) 27 Cal.4th 287, 372 [116 Cal.Rptr.2d 401, 39 P.3d 432].) Witnesses other than Johnson could, and did, testify regarding the reason for the redactions, and the prosecutor could properly comment upon the reasonableness of their evidence.

With respect to the prosecutor's second set of comments to the effect that the jury should not draw any adverse inferences from Johnson's failure to testify, the trial court properly denied the motion for mistrial. The prosecutor merely paraphrased the language of CALJIC Nos. 2.60 and 2.61, which had already been read to the jury, and explained he did not mean to suggest the jury should draw any adverse inference from Johnson's failure to testify.

Even if the prosecutor's references to Johnson's constitutional right not to testify can be regarded as error, " 'indirect, brief and mild references to a defendant's failure to testify, without any suggestion that an inference of guilt be drawn therefrom, are uniformly held to constitute harmless error. [Citations.]' " (*People v. Bradford* (1997) 15 Cal.4th 1229, 1340 [65 Cal.Rptr.2d 145, 939 P.2d 259].) Any error was accordingly harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 26 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Mincey* (1992) 2 Cal.4th 408, 446–447 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

8. *Johnson Received Effective Assistance of Counsel*

Johnson contends his trial counsel rendered ineffective assistance by failing to call him as a witness at trial. We do not agree.

■ To prevail on a claim of ineffective assistance of counsel, a defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." (*People v. Bolin* (1998) 18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d

374].) Tactical errors are generally not deemed reversible. (*Ibid.*; *Strickland v. Washington* (1984) 466 U.S. 668, 690 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

Johnson was aware of his right to testify on his own behalf and elected not to testify after "extensive discussion" with his counsel. It would be inappropriate for this reviewing court to speculate over the reason why Johnson did not testify in his own defense. (*People v. Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) Johnson's defense counsel conducted a vigorous defense of his client. He actively participated in cross-examining the prosecution's, as well as other defendants', witnesses and called two witnesses on Johnson's behalf. Johnson's election not to testify was consistent with counsel's tactical decision to put the prosecution to its proof and to expose defects in the People's case primarily through cross-examination.[13]

There is, moreover, no affirmative showing Johnson was prejudiced by his failure to testify. Other codefendants testified in their own defense, with mixed results from the jury.

We find no ineffective assistance of counsel on this record.

9. *The Trial Court Did Not Err in Instructing the Jury With CALJIC No. 17.02*

Bradley and Rahh contend the trial court erroneously instructed the jury pursuant to CALJIC No. 17.02. Bradley asserts the court should have instructd the jury under CALJIC No. 17.03 that a defendant could not be convicted of both counts because the counts were charged in the alternative. This contention has no factual basis and is without merit. Appellants were charged with both misappropriating public funds under section 424, subdivision (a) 1 *and* misusing public funds under section 424, subdivision (a) 2. We find no error in the instruction.

10. *The Trial Court Properly Excluded Evidence of the Current Mayor's Purported Use of City Credit Cards*

Appellants contend the trial court erred in refusing to admit evidence that the present mayor of Compton engaged in the same practices regarding his City credit card.

Trial courts have broad discretion in admitting or excluding evidence. (*People v. Scheid* (1997) 16 Cal.4th 1, 14–16 [65 Cal.Rptr.2d 348, 939 P.2d

---

[13] Johnson concedes his counsel's overall representation did not fall below the objective standard of reasonableness under prevailing professional norms.

748].) The current mayor took office in July 2001, and the charges in this case related to an investigation that covered the period July 1999 to September 2001. Even assuming the current mayor's practice was relevant, which we do not, it was within the court's discretion to exclude the evidence.[14]

Appellants argue that the exclusion of evidence relating to the present mayor's credit card practices deprived them of their constitutional rights to present a defense under the Sixth and Fourteenth Amendments. Appellants did not object on these grounds at trial and have waived their claim on appeal. (*People v. Alvarez* (1996) 14 Cal.4th 155, 186 [58 Cal.Rptr.2d 385, 926 P.2d 365].) Even if we were to address the issue on the merits (see, e.g., *People v. Partida* (2005) 37 Cal.4th 428, 435–436 [35 Cal.Rptr.3d 644, 122 P.3d 765]), the exclusion of such evidence did not violate appellants' due process rights by making the trial fundamentally unfair (*id.* at p. 439) or infringe upon appellants' constitutional right to present a defense (*People v. Boyette, supra,* 29 Cal.4th at pp. 427–428).

11. *The Trial Court Had Discretion to Admit Evidence of Bradley's Prior Threat to "Shut Down" the City's Firefighting Training Program*

Bradley asserts the trial court erred in allowing introduction of "irrelevant" evidence concerning a 1997 incident in which Bradley lost his temper and threatened to evict a fire department training academy after the instructors refused to accept a personal check for his son's enrollment fee.[15] At trial, Bradley objected that the evidence was irrelevant or, if relevant, unduly prejudicial under Evidence Code section 352. The trial court found the evidence admissible and probative of Bradley's proprietary attitude toward the City and his belief in an ability to control the City's assets. The court admitted the evidence for the limited purpose of showing "whether or not Bradley believed himself to own or control the City assets." We find no error.

The prosecution had the right to proffer circumstantial evidence of Bradley's attitude toward the City and the City's assets to show Bradley's state of mind. The trial court also had discretion to weigh the relevance of the evidence against its prejudicial effect under Evidence Code section 352, and we will not disturb the court's exercise of discretion. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121 [113 Cal.Rptr.2d 27, 33 P.3d 450].)

---

[14] In tentatively ruling the evidence irrelevant, the court commented that "if, in fact, [the current mayor] engaged in criminal acts, the attorney general will evaluate that and will take the appropriate action. . . . If one person robs a bank and it turns out another person did too, well, I can't imagine that we would be putting on evidence that the second person robbed the bank . . . ."

[15] A visibly upset Bradley appeared at the fire station, declared he was the mayor of the City, it was "his" fire station and he would "shut [the] academy down" on "the next business day" unless his son received special treatment.

Although Bradley further asserts that evidence of the firehouse incident amounted to inadmissible character evidence under Evidence Code section 1101, subdivision (b), Bradley failed to timely and specifically object on this basis. He thus did not preserve the issue for appeal. (*People v. Lewis* (2001) 25 Cal.4th 610, 664 [106 Cal.Rptr.2d 629, 22 P.3d 392].)

## 12. *The Trial Court Properly Sentenced Johnson*

Johnson complains that the trial court erred in finding him presumptively ineligible for probation and in failing to find this an "unusual" case entitling them to probation in the interests of justice.[16] (See § 1203, subd. (e)(7); Cal. Rules of Court, rule 4.413.) We need not decide whether the court erred in concluding Johnson was presumptively ineligible for probation or in concluding this was not an "unusual" case, as the court properly determined that Johnson would not be granted probation in any event.

A trial court has broad discretion to determine whether a defendant is suitable for probation. (*People v. Welch* (1993) 5 Cal.4th 228, 233 [19 Cal.Rptr.2d 520, 851 P.2d 802].) The determination whether a case is an "unusual" case is also within the sound discretion of the trial court. (*People v. Superior Court (Du)* (1992) 5 Cal.App.4th 822, 831 [7 Cal.Rptr.2d 177].) An appellant bears a heavy burden when attempting to show an abuse of such discretion. (*People v. Aubrey* (1998) 65 Cal.App.4th 279, 282 [76 Cal.Rptr.2d 378].) To establish abuse, the defendant must show that, under all the circumstances, the denial of probation was arbitrary, capricious or exceeded the bounds of reason. (*Du, supra,* at p. 831.)

At the sentencing hearings, the court indicated it had received and considered, for each appellant, a diagnostic study from California's Department of Corrections, a probation report, personal letters submitted on behalf of appellants and the parties' sentencing memoranda.

After carefully weighing all the appropriate factors, the court found that Johnson would not be granted probation. (Cal. Rules of Court, rule 4.414.) This finding is amply supported by the record. The court concluded that any rational person would find that appellants were in positions of trust and intentionally abused that trust by wrongfully using or permitting the use of public funds for personal reasons. The court imposed the midterm on Johnson, specifically finding that Johnson was an "active participant" having "no unusual circumstances of great provocation" and, most importantly, "took

---

[16] Bradley also raises sentencing issues, which we need not consider because the conviction as to him is reversed.

advantage of a position of trust [or] confidence to commit the crime."[17] The trial court indicated that even if Johnson were presumptively eligible for probation, it would not have granted probation to him.

Johnson contends the abstracts of judgment incorrectly refer to each crime as "embezzlement" by a public officer. We agree that this description is in error. (See *People v. Dillon, supra,* 199 Cal. at pp. 13–14; *People v. Battin* (1978) 77 Cal.App.3d 635, 659, fn. 21 [143 Cal.Rptr. 731].) However, this constitutes only a clerical error in the preparation of the abstract of judgment. The verdicts correctly refer to the crimes as "misappropriation" in count 1 and "unauthorized loan" in count 2, and the abstracts of judgment should be corrected to conform to the verdicts.

13. *The Trial Court Properly Imposed a Restitution Fine on Rahh*

In a final contention, Rahh asserts the trial court erred in imposing a restitution fine of $8,523.37 and, to the extent this claim has been waived, he received the ineffective assistance of counsel. We disagree.

"[C]omplaints about the manner in which the trial court exercises its sentencing discretion and articulates its supporting reasons cannot be raised for the first time on appeal." (*People v. Scott* (1994) 9 Cal.4th 331, 356 [36 Cal.Rptr.2d 627, 885 P.2d 1040].) This waiver applies to restitution orders. (*People v. O'Neal* (2004) 122 Cal.App.4th 817, 820 [19 Cal.Rptr.3d 202]; *People v. Le* (1995) 39 Cal.App.4th 1518, 1523 [46 Cal.Rptr.2d 566].) By failing to object to the restitution order and stipulating to the amount of the restitution, Rahh has waived his challenge to the restitution order on appeal.

Furthermore, we do not agree that the restitution order comprised an "unauthorized sentence." The evidence establishes that the City lost substantially more than $13,000 as a result of Rahh's conduct. The court therefore did not abuse its discretion in imposing the restitution order. (*People v. Tucker* (1995) 37 Cal.App.4th 1, 6 [44 Cal.Rptr.2d 1].)

■ We are also satisfied that defense counsel did not render ineffective assistance in relation to the restitution order. Failure to raise a meritless objection is not ineffective assistance of counsel. (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1394–1395 [28 Cal.Rptr.2d 860].) Because the restitution order was supported by the record, an objection by defense counsel would have been properly overruled.

---

[17] In contrast with Bradley and Johnson, Rahh, who was granted probation, acknowledged committing the offenses, expressing remorse. Rahh had joined the city council only days before the credit card resolution (unlike Bradley and Johnson, who were longtime City officials), he was older, and he was in much poorer health.

## DISPOSITION

The judgment against Bradley is reversed. The judgments against Johnson and Rahh are affirmed, and the trial court is directed to prepare an abstract of judgment that conforms to the verdict.

Bigelow, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied August 22, 2012, and appellants' petition for review by the Supreme Court was denied November 14, 2012, S205228.