Filed 11/6/13  P. v. Winslow CA2/6
**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GREG LOREN WINSLOW,<br><br>    Defendant and Appellant. | 2d Crim. No. B233380<br>(Super. Ct. No. 2009006776)<br>(Ventura County) |

Greg Winslow was head coach of the Ventura College "Pirates" men's basketball team.  Over a four-year period, he received in excess of $60,000 in donation checks from team sponsors.  Instead of submitting these checks to the college in accordance with a policy he helped develop, he deposited them into a checking account he opened for his son's youth basketball team, the similarly named "V-Town Pirates."  During the same period, Winslow wrote more than $9,000 in checks to himself, $20,000 in checks made payable to "cash," and an $800 check to his wife.  He also wrote checks to pay for repairs to his boat and for a family vacation rental.  After Winslow was fired, he turned over $20,620 in cash he claimed to have withdrawn from the account for a renovation of the team's locker room.

Winslow testified that he believed his superior had authorized him to use the "off-campus" account for Pirates donations and team-related expenditures.  He admitted knowing, however, that he lacked any authority to write checks for personal

expenses.  When asked why he never reimbursed the college for the check he wrote for his family's vacation rental, he said it was because he had spent a greater amount of his own money on team-related expenses.  When asked the same question with regard to the check he wrote for repairs to his boat, he merely offered that he "forgot" writing the check.

A jury convicted Winslow of misappropriation of public funds (Pen. Code,[1] § 424), grand theft by embezzlement (§ 487, subd. (a)), and neglecting to pay over public money (§ 425).[2]  The trial court placed him on five years' probation which included terms that he serve one year in county jail and pay $45,000 in restitution. Winslow appeals, contending the evidence is insufficient to support his conviction under section 425.  Relying on *Stark v. Superior Court* (2011) 52 Cal.4th 368 (*Stark*), Winslow also contends his conviction under section 424 must be reversed for instructional error. He further claims the court committed reversible error by failing to sua sponte instruct the jury that good faith/mistake of fact is a defense to the section 487 charge of grand theft by embezzlement.

We accept the People's concession that Winslow's conviction under section 425 must be reversed because he does not qualify as an "officer" within the meaning of the statute.  As to the section 424 charge, we conclude the error in failing to instruct the jury that Winslow could not be found guilty unless he knew, or was criminally negligent in failing to know, that he acted without legal authority (*Stark, supra*, 52 Cal.4th at p. 377) is harmless in light of Winslow's admission that he knew the checks he wrote to pay for personal expenses were unauthorized.  This admission also renders harmless any error

---

[1] All further undesignated statutory references are to the Penal Code.

[2] The jury found Winslow not guilty on charges of embezzlement by a public officer, clerk, or servant (§ 504), identity theft (§ 530.5, subd. (a)), making a false financial statement (§ 532, subd. (a)), forgery (§ 470, subd. (d)), and dissuading a witness (§ 136.1, subd. (a)).  The jury also returned not true findings on allegations that Winslow took property exceeding $50,000 in value as provided in former section 12022.6, subdivision (a)(1).

in failing to instruct that good faith/mistake of fact was a defense to the section 487 charge of grand theft by embezzlement.

## STATEMENT OF FACTS

### *Prosecution*

In 1999, Winslow was hired by Ventura College (the College) to serve as head coach of the "Pirates" men's basketball team (the Pirates). In the fall of 2003, Winslow and Nancy Frederickson became the College's co-athletic directors and were overseen by Dean of Athletics Steven Tobias.

Prior to 2004, the policies regarding the submission of donations to the College's sports programs and the distribution of those funds were informal and unwritten. In 2004, Winslow, Frederickson, and Tobias developed and formalized the policies in a written fiscal policy that was discussed at the annual coaches' meeting. Pursuant to that policy, donations are generally made by check to the Ventura College Foundation (the Foundation) or the Ventura College Athletic Association (the Association)[3] with a notation of the particular program for which the donation is intended. All donations must go through the Foundation and be deposited into the trust or agency account the College has set up for each department. As relevant here, any donations a coach received for the Pirates were to be given to either the athletic secretary or the student business office (SBO) for deposit into the trust account specifically designated for the Pirates (the trust account). All such donations are considered the property of the Ventura County Community College District (the District).

Coaches seeking access to funds in a trust account had to submit a requisition form or utilize a purchase requisition process as set forth by the District. Coaches also received a credit card to pay for team travel, meals, and equipment, and a petty cash fund was available for reimbursement of incidental travel expenses. Expenses for tournaments and for items such as trophies and field paint were to be paid for out of

---

[3] The Foundation is a nonprofit organization that acts as steward of all donations to the College. The Association is an affiliate of the Foundation that solicits funds for the College's sports programs.

3

the trust accounts through the normal procurement process. If actual expenses exceeded the amount requested, the coach could submit receipts and request reimbursement. Winslow was fully reimbursed for such out-of-pocket expenses on numerous occasions. All coaches were instructed that it would be a violation of commission on athletics (COA) rules to use District funds to pay for a student athlete's living expenses or for the repair of damage the athlete caused to property where he or she lived.

In addition to his duties at the College, Winslow also coached "the V-town Pirates," a youth basketball team on which his son played. In November 2003, Winslow opened a "booster" bank account at Commerce County Bank (CCB)[4] under the name "Greg Winslow and/or Kevin Wise Pirate Basketball Account" (the Pirate account).[5] Although the Pirate account was ostensibly opened for the V-Town Pirates, Winslow put all of the donations he received for the Pirates into the account. From November 2003 until April 2008, he deposited a total of $85,298 into the Pirate account. Of that total, $60,554 was from checks made payable to either the Pirates or the College. During the lifetime of the account, Winslow wrote checks to himself that totaled $9,242.50. He also wrote checks made payable to "cash" that totaled $24,270, only $3,450 worth of which had a memo stating their purpose.[6] Another check made payable to CCB for $3,500 was deposited into Winslow's personal account at the bank, and a check for $800 was made payable to his wife. In July 2004, he wrote a check for $2,321.21 to pay for repairs to his boat. In February 2006, he wrote a check for $1,100 to pay for half of his vacation rental

[4] CCB is a two-branch community bank that opened in 2003. Winslow was a founding shareholder.

[5] Wise, who had been a close friend of Winslow's since childhood, testified that he was not present when the Pirate account was opened. Winslow included Wise on the account to satisfy CCB's requirement that all booster accounts have two account holders. The bank employee who opened the account gave Winslow a card for Wise's signature and highlighted the signature line.

[6] One $1,500 check was for a "DVC tournament," another $1,500 check was for "referee's fees," and a $450 check was for "camp expenses."

at Seacliff Beach. Another check written in March 2006 for $1,469 was written to pay off a personal loan from Wise.

In June 2005, Winslow wrote a $307.66 check from the Pirate account to buy paint for a three-unit rental property Winslow rented from Wise on behalf of Pirates team members. Winslow testified that he knew the College would not approve this expenditure. In 2007, Winslow wrote a $1,450 check from the Pirate account to pay the first month's rent on another apartment he rented for members of the Pirates. He also wrote checks to buy mattresses for Pirates team members.

Winslow rented the College's gym to Gabriel Kirkham and Richard Thomas on behalf of the "Ventura Heat" youth basketball club in violation of the College's rules and policies. From 2005 through 2008, Thomas gave Winslow a total of $4,175 in checks that were made payable to "Pirate Basketball" or "Ventura County Pirates." Winslow deposited the checks into the Pirate account. In 2008, the Ventura Heat and the V-Town Pirates co-hosted a fundraising tournament at the gym and split the profits. At Winslow's direction, Thomas wrote a $1,000 check to "Pirate Basketball" and a $2,600 check made payable to Winslow.

Ricci Ruffinelli was the Association's president and Winslow's friend. On November 3, 2007, Ruffinelli attended a fundraiser dinner and gave Winslow a donation check payable to the Pirates. Two days later, Ruffinelli read an article in the Ventura County Star (the Star) disclosing that Winslow had an off-campus account at CCB.[7]

Ruffinelli showed Tobias a copy of the check and asked if the Foundation had an account at CCB. Tobias subsequently asked Ruffinelli to give a copy of the check to Dr. Robin Calote, the College's president. Ruffinelli told Winslow about the request and said he would demand the College get a subpoena if Winslow requested. Winslow declined and said, "Well, if they know about that, then I probably need to just resign."

---

[7] The account was apparently discovered in the course of an investigation into allegations that several members of the Pirates were paying in-state tuition even though they had not established residency in California.

Winslow added that the College did not allow coaches to have off-campus accounts and that he had a good chance of losing his job.

Joe Kreutz was the CEO of CCB. After reading the Star article about the Pirate account, Kreutz asked Winslow to clarify the purpose of the account. Winslow said the account was for the V-Town Pirates. On December 13, 2007, Winslow drafted a letter at Kreutz's request stating, "I, Greg Winslow, am the owner of Account 101002921, which I established at County Commerce Bank on November 25th, 2003. The account holds only funds belonging to V-Town Pirates, an unincorporated club basketball team operating under the AAU rules." On April 2, 2008, Winslow closed the Pirate account at Kreutz's request with a check made payable to Winslow for the balance of $1,522.70.

Wise testified he was not aware of the Pirate account and did not give Winslow permission to include his name on it. Wise did not sign the signature card and his driver's license number, zip code, and mother's maiden name were all inaccurately stated. In May or June 2008, Winslow went to Wise's office and said, "Hey, Kevin, they found the account." When Wise said he did not know what Winslow was talking about and did not remember opening any account, Winslow insisted that they had opened the account together and instructed him to say as much to the Ventura County District Attorney's (D.A.) Office. Winslow subsequently said that he wanted Wise to tell the D.A.'s office that the check he had written him on the Pirate account to pay off Wise's personal loan was actually for rent. Wise pointed out that the check was written almost a year after the Pirates team members had moved out and reiterated that Winslow had already paid the remaining portion of the back rent he owed.

In February 2011, D.A. Investigator Greg Hayes received a call from Winslow's trial counsel informing him that he would be receiving evidence from Winslow's private investigator, Gene Thayer. Thayer subsequently gave Investigator Hayes a sealed manila envelope containing $20,620 in cash.

*Defense*

Winslow testified in his own defense. He claimed he was unaware of any new rules or fiscal policies being enacted in 2004. He did not recall seeing the College's

6

written policy and denied participating in its development. He did, however, fully understand the College's donation and procurement process and knew how to obtain money from the trust account. He also knew he had to obtain receipts for all expenditures.

In August 2003, Tobias told Winslow that funding was being reduced and advised him to avoid building up the trust account because the College "could take it." The following month, Winslow asked Tobias to explain how he expected Winslow to keep the trust balance down. Tobias told Winslow to be creative and finance the men's basketball program any way he could. Winslow interpreted this to mean that he should not put the College's name on any booster account he might have. Although Tobias never actually told Winslow to open an off-campus account, Tobias had "alluded to an off-campus account" and the two of them had "discussed an off-campus account and how they used to do it with football, and we discussed to not build up our trust account." He knew the donations to the Pirates belonged to the College and admitted that "the whole intention of having an off-campus account [was] so the school couldn't take it." Tobias frequently told Winslow to "keep it on this side of the street," which Winslow understood to mean that he should not get the College's administration involved.

Winslow used the Pirate account for both the Pirates and the V-Town Pirates. He wrote separate accountings on a steno pad he kept in his office. He also had a file in which he kept receipts for purchases he made for the V-Town Pirates out of the Pirates account. He was unable to produce the steno pads or the receipts because he was not allowed to take them when he was escorted out of his office.[8] He denied ever using Pirates funds for V-Town Pirates expenses.

Winslow deposited the "huge majority" of fundraising revenue into the Pirate account. He did not put it into the trust account because "you would get penalized for having a lot of money built up . . . ." By "penalized," he meant that "big-ticket" items

---

[8] One day in April 2008, Winslow arrived at his office and was told he was being put on administrative leave. He was allowed to take a couple of boxes of his personal belongings and was prohibited from taking anything else.

would be purchased with funds from the trust account. Otherwise, Tobias would find another source of funding.

Winslow denied trying to keep the Pirate account a secret. He always intended to use the account for both the Pirates and the V-Town Pirates. When asked whether he wanted the College to know about the account, Winslow replied that he "didn't have a thought one way or the other." He acknowledged that Tobias never asked him to pay for anything out of the Pirate account and that he never wrote a single check on the account to the College.

Winslow testified that in August 2004 Tobias told him to round up the coaches who had off-campus accounts. Softball coach Susan Johnson and baseball coach Don Adams accompanied Winslow to Tobias's office later that day. Before anything was discussed, Tobias answered a telephone call and waved them out of his office. The next day, Winslow heard Tobias ask another coach if he had an off-campus account.

Winslow claimed that he told several people about the Pirate account. Although he could not recall telling Alan Dikes,[9] he was "under the impression that [Dikes] knew about [the] account because it wasn't a secret."

Winslow offered explanations for several of the checks he wrote on the Pirate account. Some of the checks he wrote to "cash" were used for "team bonding" activities like bowling, laser tag, movies, and meals. Winslow wrote the $2,321.21 check for repairs on his boat and the $1,100 check for his family's vacation rental because he did not have his personal account checkbook with him at the time. He kept the checkbook for the Pirate account in his basketball bag, which was all he had with him at the time. He thought he could pick up the boat and pay the invoice later, but the person at the counter did not know him and would not allow him to take the boat without paying the bill. Winslow was only five miles from his house, yet decided not to go home and get his own checkbook because the repair shop had stayed open after hours for him. He never reimbursed the Pirate account because he forgot he had written the check. At the

---

[9] Dikes acted as Winslow's assistant coach from 2006 to 2008. Dikes is also a member of the Association and has been a booster of the Pirates since 1988.

time he wrote it, he had spent $8,000 to $9,000 of his own money on the Pirates. He offered no documentary proof of these expenditures.

Winslow claimed that he wrote the $1,100 check for the vacation rental because the woman who rented the property would not take a credit card and Winslow only had the Pirate account checkbook with him. Winslow thought the woman was going to hold the check until he replaced it with a personal check. After the check was cashed, he did not reimburse the Pirate account because he had already spent thousands of dollars of his own money on the team.

Winslow knew it was improper to use College funds to pay for his personal expenses. He also knew he was not authorized to take money from the College, but believed that "as a coach [he] could take money from the men's basketball program." Winslow could not say whether he thought he was entitled to reimburse himself for personal expenditures he made on behalf of the Pirates, yet admitted he had done so on more than one occasion.

Winslow also knew the College would not have authorized paying for the repair of damage to Wise's rental property. He nevertheless wrote a check on the Pirate account to buy paint for Wise's property because he thought it was "the right thing to do." Winslow also knew it was a violation of COA rules to buy mattresses for Pirates team members. Whenever Winslow wrote a check on the Pirate account to buy a mattress for a team member, the team member gave him cash and Winslow deposited it into the Pirate account. He also knew it would be a violation of the rules to pay rent on behalf of any team members, and denied doing so. He merely collected rent from team members who rented Wise's property and gave it to Wise. When Wise required a check, Winslow kept the cash he collected and wrote Wise a check from Winslow's personal bank account. On one occasion, Winslow paid the rent for another apartment with a cashier's check he obtained after depositing cash into the Pirate account and writing a check on the account.

In late 2007, Kreutz called Winslow and asked him to come to the bank with documentation on the V-Town Pirates. Winslow went to the bank and gave Kreutz the team roster and a copy of its registration. Kreutz expressed concern for CCB's

9

shareholders due to the news stories regarding the Pirate account. To protect the bank, Kreutz asked Winslow to sign a letter Kreutz had drafted stating that the Pirate account only held funds belonging to the V-Town Pirates. Winslow testified that although this statement was false, he signed the letter to satisfy Kreutz.

Winslow challenged the accuracy of Ruffinelli's testimony and speculated that he had conflated two or three different conversations. When Ruffinelli spoke to Winslow about the check in January 2008, Winslow had no intention of resigning. He later told Ruffinelli that he was resigning.

Winslow testified that the $20,620 in cash he turned over in February 2011 was going to be used to refurbish the Pirates' locker room. In spring 2004, Tobias told Winslow the renovation would cost around $30,000 and that Winslow was responsible for raising the money. After speaking to Tobias in spring 2004, Winslow became "a lot more aggressive about putting money off campus" because he "wanted to raise money to redo the basketball part of the locker room, and [he] didn't want the school to be able to take that money." He began withdrawing cash from the Pirate account and storing it in a fanny pack so he could hire workers for the refurbishing. Whenever Winslow went to CCB to obtain cashier's checks,[10] he withdrew from $400 to $1,700 for his "locker room fund" and placed it in the fanny pack. Winslow also put the balance of the Pirate account (about $1,500) in the fanny pack after he closed the account.

When asked why he withdrew cash from the Pirate account in a piecemeal fashion instead of merely withdrawing the money when he needed it, Winslow said it was "[b]ecause my understanding from Mr. Tobias was to not build up a large amount in your accounts. And I knew I was going to need cash to do the locker room fund. So I never let the account get very big." The prosecutor asked Winslow to acknowledge that Tobias was referring to building up money in the trust account rather than the Pirate account, and Winslow replied, "I can't tell you what he was referring to." Winslow later added that "if

---

[10] Winslow obtained the checks on behalf of Pirates team members who were living in an apartment complex that required rent to be paid with a cashier's check. As a shareholder at CCB, Winslow received the checks for free.

10

I had a lot of money in my off-campus account, . . . then maybe [Tobias] would ask me or require me to purchase something, you know, a large item, ticket item ourselves instead of have the school pay for it." Winslow admitted, however, that Tobias had no way of knowing how much money was in the Pirate account and had never asked Winslow to pay for anything out of that account.

In August 2008, Winslow brought the fanny pack with the money to his trial attorney's office. After meeting with his attorney, he put the fanny pack and its contents in a fire safe at his mother's house. On February 1, 2011, Winslow took the fanny pack and its contents back to his attorney's office and gave it to his investigator. Winslow did not list the money as cash on hand when he declared bankruptcy pursuant to the advice of counsel.

On cross-examination, Winslow testified that all of the money in the fanny pack was withdrawn from the Pirate account and that he did not touch the money after the account was closed in April 2008. On rebuttal, the prosecution established that two of the bills in the fanny pack were not released into circulation until well after the Pirate account had been closed.

Tobias testified that he had no knowledge of the Pirate account prior to the investigation and denied ever suggesting to Winslow that he should open such an account. Had Tobias known about it, he would have taken action because it would be a violation of the College's policy. Although the District had the right to take money from the trust account, it was Tobias's understanding that all donations to the men's basketball program had to be spent on that program.

Tobias denied ever using the phrase "keep it on this side of the street." He also denied ever discussing off-campus accounts with any of the College's coaches. Tobias never told anyone that former men's basketball coach Phil Matthews had an off-campus account, and he had no reason to believe Matthews ever had such an account. He

11

did recall telling the coaches about instances where trust accounts for athletic programs at other colleges in the state had been "raided" by the college's leadership.

Tobias knew that one of the college's instructors had an off-campus account for the school's cheer squad. He believed this account was permitted because the cheer squad is not governed by the COA and the District did not allow any of the College's funds to be spent on the squad. Tobias also knew that women's softball coach Susan Johnson had an off-campus account from 2002 to 2007, but the account was for an off-campus club team and was never used for the College's team.

Tobias denied telling Winslow he could refurbish the men's basketball locker room with funds raised for the men's basketball program. The College received $117 million under Measure S in 2002, and some of that money was earmarked for the locker room. According to Tobias, the money that Winslow had purportedly set aside "wouldn't [have gone] very far to renovate anything in that locker room."[11]

Dikes testified that Tobias was present at an August 2007 dinner meeting when Ruffinelli mentioned that Winslow had an off-campus account. Tobias did not respond, which led Dikes to believe Tobias knew about the account and did not object to it. A few weeks later, Tobias told Dikes he had spoken to Ruffinelli about a donation check that had been deposited into an off-campus account. When Dikes said he was not surprised that Winslow had an off-campus account, Tobias asked, "You mean [Winslow] has an off-campus account?" Dikes testified, "if [Tobias] actually did know about this off-campus account at that time, he should get an academy award because he absolutely

---

[11] Peder Nielsen, the College's men's equipment manager, testified that everyone who attended the meetings regarding refurbishment of the locker room—which included Winslow and Tobias— proceeded under the assumption that Measure S would provide sufficient funding for the project. Twenty new lockers were purchased with funds Winslow procured from the College's Chief Financial Officer, Dr. Tom Kimberling, and there were no discussions regarding the need for additional fundraising. Gene Thayer, Winslow's investigator, testified that Nielsen said Winslow was seeking funding from outside sources with the authorization of Tobias. According to Nielsen, Thayer merely asked him whether there was a plan to refurbish the locker room and he responded in the affirmative.

looked shocked." Tobias got up, stomped around, and asked, "How long have you known about this?" Dikes told Tobias that he assumed he knew about the account because it had been mentioned during the dinner meeting. Tobias responded that he thought they were talking about Matthews' old account.

Jeff Theiler was Winslow's assistant coach from 2004 to 2007. Theiler had heard Tobias say, "keep it on this side of the street." Theiler interpreted the phrase to mean that information should not be disclosed to the College's administration, whose offices were across the street. Theiler also recounted the incident when Tobias asked Winslow "to round up" everyone who had an off-campus account. Winslow told Theiler about the Pirate account later that same day.

Don Adams, the College's baseball coach, had also heard Tobias use the phrase, "keep it on this side of the street." On two different occasions, Winslow was present when Tobias asked Adams if Adams had an off-campus account. Adams truthfully answered in the negative on both occasions.

Wayne Lorch, a certified public accountant, reviewed the banking records and spoke to Winslow about the purpose of each transaction. Based on his examination of Winslow's personal account at CCB and Winslow's proffered explanations with regard to various expenditures, Lorch prepared a schedule indicating that Winslow spent $27,938.05 of his own funds on behalf of the Pirates between December 17, 2003, and March 20, 2008. Lorch also determined that distributions from the Pirate account on behalf of the Pirates during the same period totaled $49,586.28. On cross-examination, Lorch acknowledged he had not conducted an independent audit and that his conclusions were based solely on what Winslow told him. Winslow did not offer any receipts or other documentation from which Lorch could have determined how the cash was actually spent. Lorch explained, "[W]e interviewed [Winslow] to get what his explanation is of these transactions, and . . . we relied without exception on those representations to us."

Winslow also called several witnesses who opined he has a reputation for honesty and integrity.

DISCUSSION

I.

*Insufficiency of the Evidence (§ 425)*

Winslow claims the evidence is insufficient to support his conviction for neglecting to pay over public money in violation of section 425 because he does not qualify as an "officer" under the statute. The People correctly concede the point.

Section 425 provides that "[e]very officer charged with the receipt, safe keeping, or disbursement of public moneys, who neglects or fails to keep and pay over the same in the manner prescribed by law, is guilty of [a] felony." "Officer" in this context means a "public officer," i.e., one with "a tenure of office" to which "*some portion of the sovereign functions of government*" has been delegated. (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1212.)

It is undisputed that Winslow was not an "officer" of the College, but was rather a mere employee. The jury was instructed, however, that Winslow was guilty of violating section 425 if he was either "an officer of the school district *or other person* charged with the receipt, safekeeping, transfer, or disbursement of public money." (Italics added.) This instruction was erroneous. Although anyone charged with the handling of public money can be convicted of misappropriation under section 424, only a public officer can be convicted under section 425. Because Winslow was not a public officer, his conviction under section 425 must be reversed.

II.

*Instructional Error*

A.

*Misappropriation of Public Money (§ 424, subd. (a)(1))*

Citing *Stark,* Winslow contends his conviction for misappropriating public money (§ 424, subd. (a)(1)) must be reversed because the court failed to instruct the jury on the scienter requirement as to that charge. Although we agree that the jury should have been so instructed, the error was harmless.

14

Section 424, subdivision (a)(1) provides for felony punishment of a person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who "[w]ithout authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another . . . ." The jury was instructed that Winslow was guilty of this crime if the prosecution proved he acted "knowingly and willfully and without authority of law." The jury was further instructed that "willfully" in this context "implies simply a purpose or willingness to commit the act . . . . It does not require any intent to violate the law, or to injure another, or acquire any advantage."

After Winslow was convicted, our Supreme Court held that although section 424 is a general intent crime, it requires "a broader mental state beyond a mere intent to do the act." (*Stark, supra,* 52 Cal.4th at p. 395.) The court reasoned that "[w]ithout a mental state as to legal authorization, a defendant could be convicted of violating the section 424 provisions by simply acting or failing to act, even if he was unaware of the facts, as defined by statute, that made his intent wrongful." (*Id.* at p. 396.) Accordingly, "the People must prove, as a matter of fact, *both* that legal authority was present or absent, *and* that the defendant knew of its presence or absence." (*Id.* at p. 398.) The People must show either actual knowledge or criminal negligence in failing to know the legal requirements underlying the charges. (*Id.* at p. 399.) "If public officials and others entrusted with control of public funds subjectively believe their actions or omissions are authorized by law, they are protected from criminal liability unless that belief is objectively unreasonable, i.e., is the product of criminal negligence in ascertaining legal obligations. Public officials and others should not be criminally liable for a reasonable, good faith mistake regarding their legal responsibilities. Nor is section 424 intended to criminalize ordinary negligence or good faith errors in judgment." (*Id.* at p. 400.)

As the People acknowledge, *Stark* compels us to conclude the jury should have been instructed that Winslow could not be found guilty under section 424 unless he knew, or was criminally negligent in failing to know, that he lacked the authority to commit one or more of the acts upon which his guilt was predicated. (*People v. Bradley*

15

(2012) 208 Cal.App.4th 64, 78-79 (*Bradley*).) "When, as here, the court fails to instruct on an element of an offense, we must review the record to determine if the error was harmless beyond a reasonable doubt. [Citation.] The error is reversible '"unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." [Citation.]' [Citations.]" (*Id.* at p. 79.)

Winslow contends the jury should have been instructed "that [Winslow's] reasonable good faith belief that he was following direction from his supervisor, Dean of Athletics Tobias, was a complete defense because he did not have wrongful criminal intent when he put money raised for the benefit of the Ventura College men's basketball team in the Pirate Basketball account." He also claims the determination of his guilt "hinges on whether [he] knew he was acting without authority to open [the Pirate account] or whether he held a good faith reasonable belief he had such authority."

We conclude that the failure to instruct on the scienter requirement as to the misappropriation charge was harmless because in testifying, Winslow effectively admitted possessing the requisite mental state for the crime. (*Bradley, supra*, 208 Cal.App.4th at p. 79, quoting *People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1239 ['"One situation in which an instructional error in omitting an element of an [offense] from jury consideration may be found harmless [beyond a reasonable doubt] is when "the defendant concedes or admits that element." . . .'"].) Winslow admitted writing two checks on the Pirate account to pay for personal expenses. He also admitted knowing that these transactions were unauthorized. The only reason he gave for writing the checks was that he did not have his personal checkbook with him at the time. Contrary to Winslow's suggestions, it is also clear that both transactions were matters of convenience rather than necessity. Winslow's only proffered reason for failing to reimburse the Pirate account for the check he wrote for his family's vacation rental was that he "forgot" writing the check. When asked why he never reimbursed the Pirate account for the other check, he offered that he had spent a greater amount of his own money on unreimbursed team-related expenses. When confronted with the issue, however, Winslow expressly declined to express a belief that he was authorized to reimburse himself in this fashion.

16

He also admitted reimbursing himself from the Pirate account on more than one occasion. In light of this testimony, no reasonable jury would have found that Winslow harbored an objectively reasonable good faith belief that his actions were lawful.

To the extent Winslow claimed that he intended to reimburse the College for any of these expenditures but simply forgot to do so, the jury was correctly instructed that the repayment of misappropriated funds is not a defense to the charge of misappropriating public moneys in violation of section 424. "A violation of section 424 is complete as soon as public money is willfully misappropriated to the defendant's use or the use of another. '"[I]t is the immediate breach of trust that makes the offense, rather than the permanent deprivation of the owner of his property."' [Citations.]" (*Bradley, supra*, 208 Cal.App.4th at p. 82.)[12] Any claim that Winslow did not know his conduct was a crime is equally unavailing. (*Stark, supra*, 52 Cal.4th at p. 397.)

*Bradley* is instructive. The defendants in that case were Compton's former mayor, city manager, and a city council member, all of whom were convicted of misappropriating public moneys in violation of section 424. The evidence against the city manager (Johnson) included proof that he used a city-issued credit card to rent a tuxedo while attending a conference. When the charge was questioned, the defendant confirmed the rental was a personal expense and promised to write a check to reimburse the city. He apparently never did so. (208 Cal.App.4th at p. 71.) In concluding that the failure to instruct the jury on the scienter element of section 424 was harmless as to Johnson, the court reasoned in part that "there was evidence that Johnson admitted his purchases were not authorized. When questioned by [staff] about the tuxedo rental, Johnson stated that he would have written a check if he had his checkbook, acknowledging both that he owed the City for the expense and that the charge was not a City expense." (*Id.* at pp. 79-80.)

---

**12** Winslow considers it significant that he "did not try to conceal" the fact that he wrote checks on the Pirate account to pay for repairs to his boat and for his family's vacation rental. Winslow's position is not aided, however, by the fact that he made no attempt to conceal that which was patently obvious. In any event, Winslow *did* attempt to conceal the fact that he wrote a check on the Pirate account to pay off a personal loan from Wise.

17

Winslow's position is no better. He admitted writing checks to pay for personal expenses, and also admitted knowing he had no authority to do so. By stating that he only wrote the checks because he did not have his personal checkbook with him, Winslow effectively acknowledged that he owed the College for the expense. Because the crime was completed when Winslow gave the checks as payment for his personal expenses, his after-the-fact attempt to justify his failure to reimburse the College is unavailing. In light of his admission that he had the requisite knowledge, the error in failing to instruct the jury as to that requirement was harmless beyond a reasonable doubt. (*Bradley, supra*, 208 Cal.App.4th at pp. 79-80.)

Winslow argues that notwithstanding this admission, the error in failing to instruct on the section 424 charge cannot be deemed harmless because (1) the prosecutor's closing argument emphasized that good faith was not a defense; (2) the jury deliberations were lengthy; and (3) the jury acquitted Winslow on the charge of embezzlement by a public officer, clerk, or servant (§ 504). We are not persuaded. Because Winslow admitted knowing that at least some of the transactions were unauthorized, no reasonable juror could have found he held an objectively reasonable belief to the contrary. Given the length of the trial, the number of charges, and the jury's acquittal of Winslow on half of those charges, there is nothing remarkable in the fact that the jury spent eight hours deliberating.

Also unremarkable is the fact that the jury acquitted Winslow on the charge of embezzlement by a public officer, clerk, or servant in violation of section 504. To convict Winslow on that count, the jury had to find that he acted with the specific intent to defraud. (CALCRIM Nos. 252, 1806.) Although the instruction states that "[a] good faith belief in acting with authorization to use the [appropriated] property is a defense," it goes on to provide that "[t]he defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief *completely* unreasonable, you *may* conclude that the belief was not held in good faith." (Italics added.) Section 424, by contrast, is a general intent crime of criminal negligence; as the jury was instructed, "[n]o intent to steal or defraud is required." A person who acts

18

with a good faith belief can still be found guilty of criminal negligence if that belief is objectively unreasonable. (See *People v. Butler* (2010) 187 Cal.App.4th 998, 1008-1009.) As we have noted, Winslow's admissions are fatal to any claim he acted pursuant to an objectively reasonable good faith belief that his actions were lawful.[13]

Winslow admitted using College funds to pay for personal expenses and other expenditures he knew the College would neither reimburse nor approve. Although he claimed that he expended a greater amount of his own funds on expenses related to the Pirates, he did not purport to believe that he had the right to reimburse himself for those expenditures. Moreover, he admitted having full knowledge of the College's fiscal policies and procedures, which plainly prohibited him from acting as he did. In light of this evidence, no reasonable juror could have found that Winslow lacked the required mental state to be convicted under section 424. The error in failing to instruct the jury on that mental state was thus harmless beyond a reasonable doubt. (*Bradley, supra*, 208 Cal.App.4th at p. 79.)

## B.

### *Grand Theft by Embezzlement (§ 487, subd. (a))*

Winslow claims the court committed reversible error by failing to instruct the jury that good faith was a defense to the charge of grand theft by embezzlement under section 487, subdivision (a). We disagree.

Our Supreme Court has recognized that "a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." (*People v. Tufunga* (1999) 21 Cal.4th 935, 938.) A court does not have to instruct on this defense unless there is substantial evidence "to support an inference that the defendant 'acted with

---

[13] We also note that the jury instructions on section 504 inexplicably omitted any reference to the fact that Winslow could not be found guilty of that charge unless he acted as (1) a public officer or deputy, clerk, or servant thereof; or (2) an "officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private)." (§ 504.)

a subjective belief [that] he or she had a lawful claim on the property.'  [Citation.]" (*People v. Russell* (2006) 144 Cal.App.4th 1415, 1429-1430, italics omitted.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive."  (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Even assuming that there was substantial evidence to support an instruction on good faith as a defense to the charge of grand theft by embezzlement, the error was harmless.  Although Winslow presented evidence that he acted in good faith in depositing College funds into the Pirate account and in withdrawing those funds for team-related expenses, he admitted that he had no authority to use the funds to pay for his personal expenses.  He also disavowed any belief that he had the right to use the funds to reimburse himself for expenditures he had personally made on the team's behalf.  In light of this evidence, no reasonable juror could have found Winslow acted with a good faith belief that he had the right to use College funds to pay his personal expenses, or for other expenditures he knew the College would neither approve nor reimburse.  Any error in failing to instruct on mistake of fact/good faith is thus harmless under any standard of review.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 [no reasonable probability that error affected verdict]; *Chapman v. California* (1967) 386 U.S. 18, 24 [error did not affect verdict beyond a reasonable doubt]; see also *People v. Salas* (2006) 37 Cal.4th 967, 984 [recognizing that the court has yet to decide which harmless error standard of review applies to the failure to instruct on an affirmative defense].)

In arguing that the failure to instruct on the good faith defense as to the section 487 charge was not harmless, Winslow notes that the jury acquitted him of the section 504 charge pursuant to instructions that included the defense.  We can only speculate as to the reasons why the jury acquitted Winslow on the count charging him with a violation of section 504.  As we have explained, no reasonable jury would have found that Winslow acted in good faith in using College funds to pay for his personal expenses.  If the jury so found here, we have no way of knowing whether that verdict is the result of mistake, lenity, or compromise.  (See *People v. Miranda* (2011) 192

20

Cal.App.4th 398, 406.)  Whatever the reason, Winslow is not entitled to "gain further advantage" of that verdict to the extent it is contrary to the evidence.  (See *People v. Federico* (1981) 127 Cal.App.3d 20, 33.)

DISPOSITION

Winslow's conviction for neglecting to pay over public money (§ 425) is reversed.  In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED.</u>

PERREN, J.

We concur:

GILBERT, P. J.

HOFFSTADT, J.*

---

*Assigned by the Chairperson of the Judicial Council.

21

James P. Cloninger, Judge

Superior Court County of Ventura

_____


Madeline McDowell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Marc A. Kohm, J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.