Filed 9/16/25  In re B.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re B.L., a Person Coming Under the Juvenile Court Law. | H052634 (Santa Clara County Super. Ct. No. 20JV44303F) |
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>B.L.,<br><br>      Defendant and Appellant. | |

After a contested jurisdictional hearing, the juvenile court sustained an allegation that minor B.L. committed second degree robbery (Pen. Code, § 211).  The court adjudged the offense a felony and declared B.L. a ward of the court.  At a dispositional hearing, the court committed B.L. to a ranch program at Santa Clara County's juvenile rehabilitation facility and imposed multiple terms and conditions of probation, including victim restitution with joint and several responsibility.

On appeal, B.L. asserts multiple claims of error.  Regarding the juvenile court's jurisdictional findings, B.L. claims the court erred by admitting as lay opinion a detective's testimony concerning the location of

B.L.'s cell phone during the robbery. Regarding the court's dispositional order, B.L. challenges five probation conditions on various grounds. He also contends that, under newly enacted Welfare and Institutions Code[1] section 730.6, subdivision (b)(3) (section 730.6(b)(3)), this court should strike the juvenile court's victim restitution order and remand the matter for apportionment of liability based on the percentage of his fault for the victim's losses.

For the reasons explained below, we reject B.L.'s claim of evidentiary error and affirm the juvenile court's jurisdictional order. We reverse the dispositional order and remand the matter to the juvenile court with directions to hold a new dispositional hearing and issue a new dispositional order under current law (including section 730.6(b)(3)) consistent with this opinion.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Offense and Police Investigation*[2]

On April 29, 2024,[3] K.S.[4] used Facebook Marketplace to arrange a sale of designer hats for $500 each. A supposed buyer provided K.S. a phone number and a residential address in San Jose. K.S. drove there with his sister around 10:00 p.m. to complete the sale.

When K.S. approached the residence with a box of seven hats, a man was standing outside near a trash can. According to K.S., the supposed buyer was a tall Black man "[m]ore than six-foot." K.S. placed the box on the trash

---

[1] All further unspecified statutory references are to the Welfare and Institutions Code.

[2] We state the facts from the evidence presented at the jurisdictional hearing. At that hearing, B.L. did not proffer any evidence in his defense.

[3] Unless otherwise indicated, all dates were in 2024.

[4] We refer to the victim by his initials to protect his privacy interests. (See Cal. Rules of Court, rule 8.90(b)(4).)

can. The man asked if the hats were "real." K.S. said that they were. Two other males approached wearing ski masks and pointed handguns at K.S.[5]

The supposed buyer grabbed the box of hats and ran off. The masked men told K.S. to give them everything he had. K.S. handed over a gold chain (worth $1,000), his iPhone 13 Pro, and a bag containing his wallet and about $2,000 in cash. The masked men fled and got into a black, four-door sedan. K.S. testified that one of the masked individuals was a "skinny, tall, probably six-foot" Black man. The other individual was shorter, about five feet nine inches tall. K.S. further testified that he had previously told the police that the shorter person was a Black man in his mid-20s.[6]

K.S. called the police. He also attempted to contact the supposed buyer on Facebook, but the person had blocked K.S.'s account.

San Jose Police Detective Annania Marte interviewed K.S. and authored a search warrant for K.S.'s Facebook account to obtain the messages K.S. had exchanged with the supposed buyer. Detective Marte developed information indicating that the phone number the buyer had provided to K.S. was associated with a person named Laquin Golden. Marte also found another phone number and IP address information that linked Golden to the buyer's Facebook account.

Detective Marte obtained call detail records for one of Golden's cellphones. Marte used ZetX software to interpret the records. The software mapped the movement of Golden's cellphone between 10:07 p.m. and 11:03

---

[5] K.S.'s sister testified that as she sat in a car parked on the street outside the residence, she saw one person pointing a gun at her brother. She did not get a good look at the people who robbed K.S. because their backs were facing her.

[6] In a search warrant application, a detective (based on law enforcement's past contact with B.L.) described B.L. as an Asian male approximately five feet seven inches tall.

p.m. on April 29 (the night of the robbery). The records revealed that the cell phone traveled toward the crime scene and then away from that area, first heading north and then south. The records also showed that Golden made a 25-second phone call to a phone number associated with B.L. at 10:27 p.m. on April 29.

Detective Marte obtained B.L.'s call detail records and mapped the data using ZetX software. Based on the mapping and her understanding of the case, Marte testified that B.L.'s cell phone "was within close proximity to the crime scene on the date and around the time that the robbery occurred and that it moved away from the scene . . . consistent with surveillance footage showing when the . . . suspect vehicle was gone" from the scene. Marte stated that B.L.'s cellphone left the area of the robbery around 10:39 p.m.

B.L.'s call detail records further revealed that on April 29, B.L. twice contacted a phone number associated with a person named Dwight Porsche between 9:00 p.m. and 10:30 p.m. Golden's cell phone also contacted Porsche's phone once during the same period.

Detective Marte obtained Porsche's call detail records and mapped the data using ZetX software. Based on her review of that information, Marte concluded that Porsche's cell phone "was in the area of the robbery on the date and around the time that it was reported to have occurred."

Detective Marte obtained information regarding Golden's Instagram account. The information showed that Golden followed B.L. on Instagram. The Instagram information also revealed that before the robbery (on April 13), Golden and B.L. exchanged messages that included videos depicting B.L., Porsche, and Golden boxing.

Detective Marte obtained information regarding B.L.'s Instagram account. After the robbery, B.L.'s Instagram included a photo of a Chrome

4

Hearts hat and a conversation in which B.L. appeared to offer a Chrome Hearts hat for sale for $300.

On July 17, the police searched Golden's residence and found three Chrome Hearts hats like the ones stolen from K.S. That same day, the police saw Porsche and B.L. in a black, four-door sedan (a Ford Fusion); B.L. was driving the car. The police arrested B.L. and Porsche. The police searched B.L.'s residence and found a replica gun that looked like a pistol with an extended magazine.

B. *Charges and Jurisdictional Hearing*

In July 2024, the Santa Clara County District Attorney filed a juvenile wardship petition (petition) under section 602, subdivision (a), alleging that 17-year-old B.L. committed second degree robbery (Pen. Code, § 211; count 1).

In September 2024, the juvenile court held a contested jurisdictional hearing on the petition. On September 26, the court found the robbery allegation true (count 1), determined the offense to be a felony, and found B.L. to be described by section 602.

C. *Dispositional Hearing*

On October 11, the juvenile court committed B.L. to the Santa Clara County Juvenile Rehabilitation Facilities' Enhanced Ranch Program (ranch) for a period of six to eight months. The court awarded B.L. 87 days of custody credits and imposed several probation terms and conditions, including $6,300 in victim restitution to K.S. with joint and several responsibility for B.L. and his coperpetrators. B.L.'s defense counsel confirmed that he had "gone over the conditions" with B.L. Counsel asked the court to waive the fines and fees stated in the probation conditions; the court struck those conditions. Counsel did not otherwise object to any of the

5

terms and conditions of probation and "submit[ted]" on the amount of victim restitution.

## II. DISCUSSION

B.L. raises five claims of error on appeal. He contends: (1) the juvenile court erred by admitting Detective Marte's testimony about the location of his cell phone as lay opinion; (2) three probation conditions that direct B.L. and his parent to participate in counseling programs are vague and involve an improper delegation of judicial authority; (3) a probation condition that restricts B.L.'s participation in gang activity and his visitation of areas with gang-related activity is vague and overbroad; (4) a probation condition that restricts B.L.'s attendance at any gang-related court case is overbroad and violates his First Amendment right to association and assembly; and (5) the matter should be remanded for apportionment of liability for victim restitution based on B.L.'s fault under section 730.6(b)(3).

We address B.L.'s claims in turn, discussing his challenges to the probation conditions together.

A. *Cell Phone Location Testimony*

B.L. asserts Detective Marte's testimony regarding the location of his cell phone at the time of the robbery was based on "her special knowledge and training" and thus "was a proper subject for expert testimony." B.L. points out that Marte "was never tendered as an expert" and argues that her lay opinion testimony should have been excluded. B.L. further asserts that the admission of Marte's testimony was prejudicial under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

The Attorney General responds that B.L. forfeited his appellate challenge to Detective Marte's testimony by failing to object on the ground of improper lay opinion in the juvenile court. The Attorney General further

6

contends that B.L.'s claim lacks merit because Marte's testimony constituted proper lay opinion and, regardless, any error in admitting Marte's testimony was harmless given the other evidence of B.L.'s participation in the robbery.

1. Additional Factual Background

At B.L.'s jurisdictional hearing, Detective Marte testified that at the time of the crime in April 2024, she was a detective in the San Jose Police Department's robbery unit. She had been a police officer for about six years and a detective for about two years.[7]

Detective Marte explained that people sometimes use phone numbers associated to mobile applications (like the VoIP number that the supposed buyer had provided to K.S.) as a means of concealing their identity. B.L.'s defense counsel objected to this testimony on the grounds of speculation, foundation, and "[i]mproper expert opinion." The juvenile court responded to the objection by saying, "I would treat it as lay opinion based on her experience. Certainly, she is not an expert, nor does she purport to be, but her lay opinion based on her experience I would accept, so I overrule the objection."

Defense counsel similarly objected on foundation and improper expert opinion grounds to Detective Marte's explanation that an "IP address" is "a unique string of characters [] that's associated to one specific device." The juvenile court overruled the defense objection saying, "Again, I would not interpret the statement by the witness as providing expert opinion. I think it's lay opinion based on experience."

Later in the prosecutor's direct examination, Detective Marte described her knowledge of "call detail record" data and cell towers/sites. Marte

---

[7] The prosecutor did not seek to qualify Detective Marte as an expert witness on any subject matter.

explained that call detail records include "outgoing/incoming phone calls, text messages that a phone number has made or received within a certain timeframe location," "information citing which cell sites, cell towers, that the . . . device has connected to," and "subscriber information for the phone number." Marte explained that as a cell phone moves geographically it "is connecting to what are called cell towers. These are just transmission devices that help our phones use data, make calls, send or receive text messages. They're just the source of connection for the devices." Marte said she knew "this because [she] took a[n] 80-hour ZetX [] training course."

Detective Marte described ZetX as the software that she uses to interpret the call detail records obtained from cellular companies and said that the ZetX training "explain[ed] what cell towers are and how devices connect." B.L.'s defense counsel objected to Marte's testimony and moved to strike it based on "a lack of foundation and improper expert opinion." The juvenile court overruled the objection stating that Marte had "again" given her "lay opinion based on experience and training. She's described the training that she received. That subject can be explored on cross-examination perhaps, but I'll permit the testimony." Marte testified further that during her tenure as a police officer, she had obtained search warrants for call detail records over 50 times and had used the ZetX software to interpret that data each time.

Detective Marte stated that a cell phone does not need to have a call in progress to connect to a cell tower. She explained that a cell phone "is always going to try to connect to the tower with the best signal and as it's doing that, that's how the location information is developed by these carriers." Defense counsel objected and moved to strike Marte's explanation on the grounds of lack of foundation and improper expert opinion. The juvenile court

responded by asking Marte, "To the extent you've been testifying about cell towers, [call detail records] data, and the like, is this information that you have garnered through your ZetX training or otherwise?" Marte replied, "It's through the training." The court overruled defense counsel's objection.

The prosecutor asked Detective Marte, based on her training and experience, "if a cell phone is further away from a tower, will it have a less good signal?" Marte answered, "Correct." Defense counsel objected and moved to strike this testimony based on a lack of foundation and improper expert opinion. The juvenile court overruled the objection saying, "The witness already testified that she's gotten this knowledge from the ZetX training. If the People want to ask more questions about it, they can. I'm satisfied that this answer comes from that training, so I'll allow it as acceptable lay opinion."

Detective Marte explained that the ZetX software "takes the raw data provided by a cell phone carrier" (which contains the coordinates of the cell sites to which the cell phone had connected) and "essentially maps it out for a user-friendly viewpoint of each data point." Marte further explained that "ZetX software produces what's called a Google Earth KML file. That file is opened up by Google Earth and that is what provides me the map of each data point located within the carrier's raw data." Marte confirmed that the software she used to generate the maps in this case appeared to be "in working order."

When the prosecutor moved to admit the "five Excel [spread]sheets" comprising the call detail records for Golden's cell phone, B.L.'s defense counsel objected "on hearsay grounds." The court admitted the call detail records over counsel's objection. The court similarly admitted (over a defense objection on hearsay and foundational grounds) the maps generated by

9

Detective Marte using the ZetX software on Golden's call detail records. Marte explained that the maps depicted the location of cell towers and the coverage area (or "wedge") emanating from the cell tower within which the device was located at a particular time.

The prosecutor asked Detective Marte to explain the movement of Golden's cell phone before the robbery. Defense counsel objected to the prosecutor's question on lack of foundation and improper expert opinion grounds. The court overruled the objection. Marte described the movement of Golden's cell phone (based on the admitted maps) before the robbery. She also described the movement of Golden's cell phone away from the crime scene. Defense counsel interjected saying, "I'm going to object as well to foundation, improper expert opinion. [¶] Your Honor, if I could just have a standing objection to this line of questioning, I think that could speed things along." The court responded, "Yes. That's fine." The court also overruled defense counsel's objection.

As discussed *ante* (pt. I.A.), Detective Marte obtained call detail records for B.L.'s cell phone. Marte testified that she inputted that data into the ZetX software to generate a Google Earth file mapping B.L.'s call detail records. When the prosecutor moved to admit those maps into evidence, defense counsel "[s]ubmitted," and the juvenile court admitted the maps.

After the maps generated from B.L.'s call detail records were admitted, the prosecutor asked Detective Marte: "Based on the totality of the maps . . . and your understanding of the case, . . . what, if anything, did you come to understand about the number associated to [B.L.,] . . . that phone number's position during the time of the robbery?" Without any defense objection, Marte answered: "I found that [B.L.'s] device was within close proximity to the crime scene on the date and around the time that the robbery occurred

10

and that it moved away from the scene . . . consistent with surveillance footage showing when the . . . suspect vehicle was gone" from the scene. Marte also testified (without objection) that B.L.'s cell phone left the area of the robbery around 10:39 p.m.

Detective Marte additionally testified about maps generated from Porsche's call detail records. When the prosecutor moved to admit the maps, defense counsel "[s]ubmitted," and the juvenile court admitted the maps. Based on her review of those maps, Marte concluded that Porsche's "device was in the area of the robbery on the date and around the time that it was reported to have occurred." Under questioning by the court, Marte said "the area of the robbery" "mean[s] that it's within the close proximity to the crime scene." She could not provide the court "an exact distance," but said "it's very close."

On cross-examination, defense counsel asked Detective Marte how close a cell phone must be to a cell tower to "ping it or access it or have your phone connect to it." Marte stated that she could not "give an exact distance" or "proper number honestly." She acknowledged that several factors could affect how a cell phone connects to a cell tower, such as topography and weather. Based on her "training through this ZetX program and the software," Marte testified, "I know whatever is depicted here [on the maps] is telling me that this device is within the general area of where this tower is." Marte continued: "Again I can't give you an exact distance, but it's within very close proximity." Marte acknowledged that she could not say whether a cell tower was functioning correctly, but she added "if [a cell phone is] connecting to a tower[,] it's safe to assume that it's functioning."

11

## 2. Legal Principles

"Opinion testimony is generally inadmissible at trial. [Citations.] Two exceptions to this rule exist. First, a properly qualified expert, with 'special knowledge, skill, experience, training [or] education' may provide an opinion. (Evid. Code, § 801, subd. (b).) The subject matter of such an opinion is limited to 'a subject that is sufficiently beyond common experience that [it] would assist the trier of fact.' (*Id.*, subd. (a).)" (*People v. Chapple* (2006) 138 Cal.App.4th 540, 546.) Second, "[l]ay opinion is also admissible, but it plays a very different role than expert opinion and is subject to different rules of admissibility." (*Id.* at p. 547.)

"A ' "lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." [Citations.] "By contrast, when a lay witness offers an opinion that goes beyond the facts the witness personally observed, it is held inadmissible." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 231; see also *People v. DeHoyos* (2013) 57 Cal.4th 79, 131 ["Matters that go beyond common experience and require particular scientific knowledge may not properly be the subject of lay opinion testimony."]; Evid. Code, §§ 702, subd. (a), 800.[8]

"The decision whether to permit lay opinion rests in the sound discretion of the trial court." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 83 (*Bradley*); see also *People v. Phillips* (2022) 75 Cal.App.5th 643, 686; *People v. Leon* (2015) 61 Cal.4th 569, 600.) " 'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be

---

[8] Evidence Code section 800 provides: "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

12

disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." [Citation.]  When evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error.' " (*People v. Young* (2019) 7 Cal.5th 905, 931; see also *Watson, supra*, 46 Cal.2d at p. 836.)

"[T]he general rule [is] that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756.)  "[T]he requirement of a specific objection serves important purposes. But, to further these purposes, the requirement must be interpreted reasonably, not formalistically." (*People v. Partida* (2005) 37 Cal.4th 428, 434.)  "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*Id.* at p. 435.)  A party "may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial.  A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Ibid.*)

    3. Analysis

B.L. contends "Detective Marte's lay opinion that B.L.'s phone was in 'close proximity' to the scene at the time of the robbery should have been ruled inadmissible."  B.L.'s defense counsel, however, did not object when Marte testified to her conclusion about the location of B.L.'s cell phone.

Courts have held that a defendant's failure to object to testimony on the ground of improper lay opinion forfeits an appellate claim resting on that

13

ground.  (See *Bradley*, *supra*, 208 Cal.App.4th at p. 83; see also *People v. Farnam* (2002) 28 Cal.4th 107, 153; Evid. Code, § 353, subd. (a).)

In reply to the Attorney General's forfeiture argument, B.L. asserts that his defense "counsel's objections on the grounds of 'improper expert opinion' 'fairly informed' the juvenile court and prosecutor that [Detective Marte's] testimony fell outside of the permissible subject matter of lay opinion and/or was somewhere in between expert and lay opinion."  He further asserts that the juvenile court's "responses to counsel's objections" (in which the court invoked lay opinion) "confirmed this interpretation."

We agree with the Attorney General that forfeiture applies under the present circumstances.  As detailed *ante* (pt. II.A.1.), B.L.'s defense counsel did not to object to the prosecutor's question that elicited Detective Marte's testimony about the location of B.L.'s cell phone (based on the admitted, ZetX-generated maps) at the time of the robbery.  Counsel also did not object to Marte's answer that she found B.L.'s cell phone "was within close proximity to the crime scene" at that time.

Additionally, we decide that defense counsel's "standing objection" based on "foundation" and "improper expert opinion" made earlier, during Detective Marte's testimony about the movement of Golden's cell phone, failed to fairly apprise the juvenile court and the prosecutor of the ground B.L. now raises on appeal.  Defense counsel said his standing objection applied to "this line of questioning," which the court and the prosecutor could have reasonably understood as applying only to testimony about the movement of Golden's cell phone, not all subsequent testimony regarding the location/movement of any other cell phone in the case.

B.L. seemingly asserts further that because the juvenile court rested its various prior rulings on an allegedly erroneous lay opinion rationale, the

14

court and prosecutor were " 'fairly informed' " by defense counsel's multiple objections that the court's rationale for allowing Detective Marte's testimony as lay opinion was itself erroneous. We do not agree that, under the present circumstances, the court's mere statement of a rationale for admitting Marte's testimony amounts to fair notice that the objected to testimony contravenes the evidentiary rules governing the court's stated rationale and was inadmissible under those rules. If B.L.'s defense counsel disagreed with the court's lay opinion rationale, counsel needed to say so to preserve that issue for appeal.

For these reasons, we conclude that B.L. forfeited his appellate challenge to Detective Marte's testimony about his cell phone's location on the ground of improper lay opinion. (See *Bradley*, *supra*, 208 Cal.App.4th at p. 83; see also *People v. Marks* (2003) 31 Cal.4th 197, 228 ["A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal."].)

Assuming arguendo that B.L.'s claim was not forfeited and, further, that Detective Marte's conclusion about the location of B.L.'s cell phone should not have been admitted as lay opinion testimony, we are not convinced Marte's testimony was prejudicial to the outcome of B.L.'s jurisdictional hearing. The *Watson* "standard requires us to evaluate whether the defendant has demonstrated that it is ' "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." ' " (*People v. Gonzalez* (2018) 5 Cal.5th 186, 195.)

The prosecutor presented other, significant evidence to prove B.L.'s guilt of second degree robbery. The prosecutor placed in evidence the call detail records for Golden's cell phone, as well as maps (generated using call detail records the police had obtained for all three suspects) depicting the

coverage areas in which Golden's, B.L.'s, and Porsche's phones were located around the time of the robbery.[9] According to Detective Marte's testimony, the call detail records included the location data underlying the maps and further showed that B.L., Golden, and Porsche were in contact with each other around the time of the robbery. Additionally, the prosecutor presented evidence from Instagram that similarly proved the interconnectedness of the three suspects. B.L.'s Instagram account further showed that he possessed and attempted to sell a Chrome Hearts hat after the robbery. Moreover, a search of B.L.'s residence revealed a black replica handgun, and the evidence established that B.L. drove a black four-door sedan like the one used by the robbers.

On this record, we conclude that any error in admitting Detective Marte's testimony about the proximity of B.L.'s cell phone to the crime scene was not prejudicial to the result of B.L.'s jurisdictional hearing.

B. *Probation Conditions*

In three separate claims of error, B.L. challenges a total of five probation conditions imposed by the juvenile court (condition Nos. 16, 17, 21, 25 & 37). B.L. asserts variously that each condition is vague, overbroad, an improper delegation of judicial authority, and/or violative of his First Amendment rights. He acknowledges having failed to object to any of the conditions he challenges on appeal, but he argues that his current claims are cognizable because they involve facial challenges that present pure questions of law.

The Attorney General responds that B.L.'s claims are forfeited to the extent he argues the probation conditions are unconstitutional as applied to

---

[9] B.L. makes no argument on appeal challenging the admissibility of Golden's call detail records or the ZetX-generated maps.

him personally. The Attorney General additionally contends that none of B.L.'s challenges to the conditions has merit.

### 1. Legal Principles

"When a minor is made a ward of the juvenile court and placed on probation, the court 'may impose and require any and all reasonable conditions that it may determine fitting and proper to the end that justice may be done and the reformation and rehabilitation of the ward enhanced.' [Citations.] ' "In fashioning the conditions of probation, the . . . court should consider the minor's entire social history in addition to the circumstances of the crime." ' [Citation.] The court has 'broad discretion to fashion conditions of probation' [citation], although 'every juvenile probation condition must be made to fit the circumstances and the minor.' " (*In re P.O.* (2016) 246 Cal.App.4th 288, 293–294; see also *In re D.N.* (2022) 14 Cal.5th 202, 206–207 (*D.N.*).)

"The permissible scope of discretion in formulating terms of juvenile probation is even greater than that allowed for adults. '[E]ven where there is an invasion of protected freedoms "the power of the state to control the conduct of children reaches beyond the scope of its authority over adults." ' [Citation.] This is because juveniles are deemed to be 'more in need of guidance and supervision than adults, and because a minor's constitutional rights are more circumscribed.' [Citation.] Thus, ' "a condition of probation that would be unconstitutional or otherwise improper for an adult probationer may be permissible for a minor under the supervision of the juvenile court." ' " (*In re Victor L.* (2010) 182 Cal.App.4th 902, 910 (*Victor L.*); accord *In re Sheena K.* (2007) 40 Cal.4th 875, 889 (*Sheena K.*).)

" 'The juvenile court has wide discretion to select appropriate conditions,' but '[a] probation condition that imposes limitations on a person's

17

constitutional rights must closely tailor those limitations to the purpose of the condition to avoid being invalidated as unconstitutionally overbroad.' " (*In re Ricardo P.* (2019) 7 Cal.5th 1113, 1118, quoting *Sheena K.*, *supra*, 40 Cal.4th at pp. 889, 890.) "The essential question in an overbreadth challenge is the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights—bearing in mind, of course, that perfection in such matters is impossible, and that practical necessity will justify some infringement." (*In re E.O.* (2010) 188 Cal.App.4th 1149, 1153 (*E.O.*).)

"Under the void for vagueness doctrine, based on the due process concept of fair warning, an order ' "must be sufficiently precise for the probationer to know what is required of him, and for the court to determine whether the condition has been violated." ' [Citation.] The doctrine invalidates a condition of probation ' " 'so vague that [people] of common intelligence must necessarily guess at its meaning and differ as to its application.' " ' [Citation.] By failing to clearly define the prohibited conduct, a vague condition of probation allows law enforcement and the courts to apply the restriction on an ' " 'ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application.' " ' " (*Victor L.*, *supra*, 182 Cal.App.4th at p. 910, quoting *Sheena K.*, *supra*, 40 Cal.4th at p. 890.) "[A] probation condition should not be invalidated as unconstitutionally vague ' " 'if any reasonable and practical construction can be given to its language.' " ' " (*People v. Hall* (2017) 2 Cal.5th 494, 501.)

"Under the separation of powers doctrine (Cal. Const., art. III, § 3), judicial powers may not be delegated to nonjudicial officers. [Citation.] While the probation officer may properly specify the details necessary to effectuate the court's probation conditions, it is the court's duty to determine

18

the nature of the requirements imposed on the probationer." (*People v. Smith* (2022) 79 Cal.App.5th 897, 902 (*Smith*).) Put differently, the "general rule [is] that a court may dictate the basic policy of a condition of probation, leaving specification of details to the probation officer. . . . 'However, the court's order cannot be entirely open-ended. It is for the court to determine the nature of the prohibition placed on a defendant as a condition of probation.' " (*Victor L.*, *supra*, 182 Cal.App.4th at p. 919, quoting *People v. O'Neil* (2008) 165 Cal.App.4th 1351, 1359; see also *D.N.*, *supra*, 14 Cal.5th at p. 209 ["[C]ourts have found an improper delegation when the juvenile court has given nonjudicial persons or institutions complete discretion over a significant aspect of the court's legal control of the minor."].)

"Even absent an objection, a defendant may, on appeal, argue a condition is unconstitutional if the claim presents a ' " 'pure question[] of law that can be resolved without reference to the particular sentencing record developed in the trial court.' " ' "[10] (*People v. Moran* (2016) 1 Cal.5th 398, 403, fn. 5 (*Moran*); see also *Smith*, *supra*, 79 Cal.App.5th at p. 901; *In re Shaun R.* (2010) 188 Cal.App.4th 1129, 1143.)

We review constitutional challenges to probation conditions de novo. (*Smith*, *supra*, 79 Cal.App.5th at p. 902; *People v. Appleton* (2016) 245 Cal.App.4th 717, 723.) "When construing probation conditions, we consider their context and we use common sense." (*Smith*, at p. 902.)

---

[10] Given B.L.'s assertion that his claims involve facial challenges that present pure questions of law, we limit our review of B.L.'s claims to the purely legal inquiry of whether the challenged conditions are unconstitutional on their face. (See *Sheena K.*, *supra*, 40 Cal.4th at pp. 885, fn. 5 & pp. 888–889 [facial constitutional challenges permitted regardless of a failure to object at trial].)

19

2. <u>Analysis</u>

a. Probation Condition Nos. 16, 17, and 37

Condition No. 16 provides "[t]hat said minor and his parent participate in a counseling or education program as determined at the [r]anch."

Condition No. 17 provides "[t]hat said minor and his parent be ordered to enroll in and complete a family counseling program at the [r]anch."

Condition No. 37 provides "[t]hat said minor and [his/her] [parent(s)/legal guardian(s)] be ordered to enroll in and complete a drug/alcohol counseling program as determined by the [p]robation [o]fficer."

B.L. contends that these three conditions should be stricken or modified because they impermissibly "delegate to the probation officer whether the program will be educational or counseling, the frequency and duration of the program, and potentially other important details."

B.L. further contends that condition Nos. 16, 17, and 37 are unconstitutionally vague because he "cannot possibly know what" those conditions "require of him." He argues that "[w]ithout sufficient guidance, the programs required in condition [Nos.] 16, 17, and 37 are left to the whim of the particular probation officer, which is plainly arbitrary."

As written, condition No. 16 grants unspecified officials at the ranch unfettered discretion to determine the "counseling or education program" in which B.L. and his parent must participate. Courts have struck down analogous conditions as an improper delegation of judicial authority. (See, e.g., *Smith, supra,* 79 Cal.App.5th at p. 903 [holding unconstitutional a condition that delegated to the probation officer the decision whether the defendant had to attend a residential program, as opposed to an outpatient program]; see also *D.N., supra,* 14 Cal.5th at pp. 209–210, fn. 4.) Condition No. 16 gives probation or the ranch the power to select *either* a counseling or

20

education program without parameters or limitations. Additionally, the condition does not specify the type or focus of the counseling or education program, who at the ranch should select such a program, or whether the minor and his parent would continue in the program after his release from the ranch. The generic nature of this condition distinguishes it from conditions upheld by courts. (See, e.g., *People v. Penoli* (1996) 46 Cal.App.4th 298, 307–308 (*Penoli*) [upholding a condition that granted authority to the probation department to unilaterally select *a residential drug rehabilitation* program].)

Accordingly, we decide condition No. 16 constitutes an improper delegation of judicial authority and thus reverse the juvenile court's dispositional order. On remand for a new dispositional hearing, the juvenile court shall either omit condition No. 16 from the new dispositional order or modify that condition to specify the type of counseling or education program in which B.L. and his parent are required to participate.[11]

By contrast to condition No. 16, condition Nos. 17 and 37 ordered B.L. and his parent to enroll in two specific types of counseling programs, namely "a family counseling program at the [r]anch" and "a drug/alcohol counseling program as determined by the [p]robation [o]fficer." The specificity of these conditions distinguishes them from condition No. 16 and arguably makes them reiterative of condition No. 16 with respect to the type of counseling program in which B.L. and his parent must participate. Hence, we decided that neither condition No. 17 nor condition No. 37 involves an unlawful delegation of judicial power or is unconstitutionally vague. (See *Penoli*,

---

[11] Given our conclusion that condition No. 16 amounts to an improper delegation of authority and must be modified, we do not consider B.L.'s further argument that that condition is unconstitutionally vague.

*supra*, 46 Cal.App.4th at pp. 307–308; *Victor L.*, *supra*, 182 Cal.App.4th at p. 919; *Sheena K.*, *supra*, 40 Cal.4th at p. 890.)

### b. Probation Condition No. 21

Condition No. 21 provides "[t]hat said minor not knowingly participate in any gang activity and not visit any specific location known to him to be, or that his/her [p]robation [o]fficer informs him to be, an area of gang-related activity."

Relatedly, condition No. 26 provides: "For the purposes of these gang conditions, the words gang and gang-related activity refer to a criminal street gang as defined in Penal Code [s]ection 186.22[,] subdivisions (e) and (f)."[12]

B.L. contends condition No. 21 is unconstitutionally overbroad because "it could forbid [him] from visiting his own home or neighborhood" and infringes on his constitutional rights to free assembly, free association, and travel. He further claims the condition is unconstitutionally vague because "[i]t does not specify the meaning of the term 'gang activity' " and is "too imprecise"—notwithstanding the provision's reference to the probation officer informing him about an area of gang activity.

Regarding B.L.'s overbreadth challenge, we look to "the closeness of the fit between the legitimate purpose of the restriction and the burden it imposes on the defendant's constitutional rights." (*E.O.*, *supra*, 188 Cal.App.4th at p. 1153.) "[A] facial overbreadth challenge is difficult to sustain." (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 577)

Generally, "[t]he right to associate . . . 'may be restricted if reasonably necessary to accomplish the essential needs of the state and public order.'

---

[12] Penal Code section 186.22, subdivision (e) defines " 'pattern of criminal gang activity.' " Penal Code section 186.22, subdivision (f) defines " 'criminal street gang.' "

22

[Citations.] Such restrictions are 'part of the nature of the criminal process. [Citation.]' [Citation.] A limitation on the right to associate which takes the form of a probation condition is permissible if it is '(1) primarily designed to meet the ends of rehabilitation and protection of the public and (2) reasonably related to such ends.' " (*People v. Lopez* (1998) 66 Cal.App.4th 615, 627–628 (*Lopez*).) A court may impose probation conditions barring association with gang members to discourage involvement in gang-connected activity. (See *id.* at pp. 624–626; *People v. Robinson* (1988) 199 Cal.App.3d 816, 818.)

Similarly, "[a]lthough criminal offenders placed on probation retain their constitutional right to travel, reasonable and incidental restrictions on their movement are permissible." (*Moran*, *supra*, 1 Cal.5th at p. 406.) "Imposing a limitation on probationers' movements as a condition of probation is common, as probation officers' awareness of probationers' whereabouts facilitates supervision and rehabilitation and helps ensure probationers are complying with the terms of their conditional release." (*Ibid.*)

In pressing his overbreadth claim, B.L. relies on *In re H.C.* (2009) 175 Cal.App.4th 1067 and *Victor L.*, *supra*, 182 Cal.App.4th 902. Those cases do not support B.L.'s argument. *H.C.* involved a probation condition directing that the minor could " 'not frequent any areas of gang related activity and not participate in any gang activity.' " (*H.C.*, at p. 1072.) The *H.C.* court noted the uncertainty in the "phraseology of 'frequent' " in relation to " 'being in areas of gang related activity' " (*ibid.*) and concluded "[a]t the very least the condition, . . . should be revised to say that the minor not visit any area known to him to be a place of gang related activity." (*Ibid.*) Condition No. 21

23

is analogous to the *H.C.* court's proposed revision. Thus, *H.C.* does not bolster B.L.'s overbreadth challenge to condition No. 21.

In *Victor L.*, the Court of Appeal reviewed a probation condition that ordered the minor to stay away from " 'any areas where gang members are known by [m]inor to meet or get together, or areas known by [m]inor for gang-related activity' " and not to participate in any gang activity. (*Victor L.*, *supra*, 182 Cal.App.4th at p. 913, fn. 7.) The *Victor L.* court agreed with minor that that condition "is impermissibly vague in that it does not provide notice of what areas he may not frequent or what types of activities he must shun." (*Id.* at p. 914.) Accordingly, the court ordered the condition modified but only to include the following italicized language: " 'The [m]inor shall not be in any areas where gang members are known by [m]inor to meet or get together, or areas known by [m]inor for gang-related activity (*or specified by his probation officer as involving gang-related activity*), nor *shall he* participate in any gang activity.' " (*Id.* at pp. 931–932.)

In reaching its conclusion, the *Victor L.* court acknowledged that "if a minor lived within the area described by the gang-related boundaries, his banishment from it would be constitutionally suspect. [Citation.] If he worked or went to school in the district so defined, the condition would need to permit travel as necessary to attend to those aspects of his livelihood or education." (*Victor L.*, *supra*, 182 Cal.App.4th at pp. 916–917, fn. omitted.) Nevertheless, the *Victor L.* court concluded that its modification—which "allow[ed] specification of exact limits to be made by the probation officer on an individualized basis"—made "the condition of probation both clear enough to avoid a vagueness challenge and narrow enough to escape a claim of overbreadth." (*Id.* at p. 918.)

24

The modified probation condition in *Victor L.* is akin to condition No. 21. (*Victor L.*, supra, 182 Cal.App.4th at pp. 931–932; see also *People v. Nice* (2016) 247 Cal.App.4th 928, 951–952.) Hence, we cannot say condition No. 21 is, on its face, invalid in all circumstances. We thus reject B.L.'s facial overbreadth challenge.

We likewise are not persuaded by B.L.'s vagueness challenge to condition No. 21. B.L. asserts that that condition "lacks sufficient detail to provide [him] with fair warning of what activities are prohibited." B.L.'s assertion is unavailing because he fails to recognize the definitional framework provided by condition No. 26 for "the words gang and gang-related activity." Considering condition No. 21 together with condition No. 26, we conclude condition No. 21 is not unconstitutionally vague with respect to its restrictions on B.L.'s participation in "any gang activity" and his visits to "an area of gang-related activity." (See *In re Oswaldo R.* (2017) 11 Cal.App.5th 409, 417–418; *Lopez*, supra, 66 Cal.App.4th at p. 634.)

c. Probation Condition No. 25

Condition No. 25 provides: "You must not knowingly attend any gang-related case unless at least one of these things is true: [¶] 1-You are a party to the case. [¶] 2-You or a member of your immediate family is a victim of the activity charged in the case. [¶] 3-You are there to obey a subpoena, summons, court order, or other official order to attend. [¶] 4-A party's attorney has asked you to testify or to speak to the court. [¶] In all other cases, you must stay at least 50 feet away from the entrance to any courtroom or courthouse where you know there is a gang-related case going on. [¶] A gang-related case is a court case that you know involved charges of gang-related activity, or other charges against a person you know or have been told by your probation officer is a member of a gang. A gang is a

25

'criminal street gang' as defined in section 186.22 of the Penal Code.  [¶]  You must not try to scare or otherwise cause anyone not to take part in a gang-related case.  This includes a witness, victim, juror or court worker.  You must not try to get any witness in any court case not to testify.  You must not try to get them to change their testimony."

B.L. contends condition No. 25 is unconstitutionally overbroad because it "unduly interferes with [his] access to courthouses and other public spaces in contravention of his First Amendment rights to association and assembly."

"The constitutional right of access to judicial proceedings is not absolute."  (*Alvarez v. Superior Court* (2007) 154 Cal.App.4th 642, 651; see also *In re Laylah K.* (1991) 229 Cal.App.3d 1496, 1502, disapproved of on another ground by *In re Sade C.* (1996) 13 Cal.4th 952, 962, fn. 2 [upholding a restriction on court attendance aimed at preventing the gathering of gang members to intimidate witnesses at court proceedings as "reasonably designed to address the problem of gang affiliation"].)

Condition No. 25 is similar but not identical to language proposed by a different panel of this court as a substitute for a courthouse restriction that it deemed overbroad.  (See *E.O.*, *supra*, 188 Cal.App.4th at p. 1157, fn. 5.)  The critical difference between condition No. 25 and the *E.O.* court's substitute is that condition No. 25 applies to "the entrance to any courtroom *or courthouse* where you know there is a gang-related case going on" (italics added) whereas the condition suggested by the *E.O.* court applies to only "the entrance to *any courtroom* where you know there is a gang-related case going on." (*E.O.*, at p. 1157, fn. 5, italics added.)

Given the holding of the *E.O.* court and the fact that we are reversing and remanding this matter for a new dispositional hearing, if the juvenile court on remand intends to reimpose condition No. 25, we direct the court to

26

reconsider whether the restriction on B.L.'s presence within 50 feet away of the entrance to any *courthouse* is reasonably necessary and closely tailored to the purpose underlying condition No. 25.  (See *E.O.*, *supra*, 188 Cal.App.4th at p. 1157.)

C. *Victim Restitution*

At the October 2024 dispositional hearing, the juvenile court ordered B.L. and his parent to pay $6,300 in restitution to K.S. for his losses (§ 730.6).  In stating this order, the court adopted the probation department's recommendation that "[B.L.] and his co-participant(s) are jointly and severally responsible for the payments of restitution."

Effective January 1, 2025, Assembly Bill No. 1186 (2023–2024 Reg. Sess.) amended section 730.6 to add the following provision:  "For the purposes of victim restitution, each minor shall be held severally liable, and *shall not be held jointly and severally liable as co-offenders.*  The court shall apportion liability based on each minor's percentage of responsibility or fault for all economic losses included in the order of restitution.  The aggregate amount of apportioned liability for all minors involved shall not exceed 100 percent in total."  (§ 730.6(b)(3), italics added; Stats. 2024, ch. 805, § 6.)

Relying principally on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), B.L. contends direct victim restitution imposed under section 730.6 is punishment and thus he is entitled to a remand for reconsideration of the restitution order given section 730.6(b)(3)'s current prohibition on joint and several liability.  The Attorney General disagrees, arguing that direct victim restitution is not punishment and therefore not subject to retroactive application in this case.

Because we conclude that the juvenile court's dispositional order must be reversed and the matter remanded for another reason related to the

27

probation conditions (see pt. II.B.2.a., *ante*), we do not decide whether section 730.6(b)(3) amounts to ameliorative legislation that should apply under *Estrada* to nonfinal judgments like the present one. Rather, we direct that when the juvenile court holds a new dispositional hearing and issues a new dispositional order on remand, the court shall apply current law, including amended section 730.6.

## III. DISPOSITION

The juvenile court's October 11, 2024 dispositional order is reversed. The matter is remanded with directions to the juvenile court to hold a new dispositional hearing and issue a new dispositional order under current law, including Welfare and Institutions Code section 730.6, subdivision (b)(3), that is consistent with this opinion's conclusions regarding probation condition Nos. 16 and 25. The juvenile court's September 26, 2024 jurisdictional order is affirmed.

_____
Danner, Acting P. J.

WE CONCUR:


_____
Bromberg, J.



_____
Rodriguez, J.*




**H052634**
*People v. B.L.*


\* Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.